**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION**

| | | |
|---|---|---|
| WILLIAM LEE, GENNET THOMPSON, | ) | |
| and GERTRUDE "TRUDY" MORGAN, | ) | |
| individually and on behalf of | ) | |
| a class of similarly situated persons, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| EPHREN TAYLOR,  WENDY CONNOR, | ) | **CLASS ACTION COMPLAINT** |
| DWANYE CONNOR, INFORMATION | ) | |
| ENTERPRISES  UNLIMITED, INC., | ) | (Jury Trial Demanded) |
| SWEEPSVEND, LLC, WALDO EMERSON | ) | |
| BRANTLEY,  DON RICARDO MCCARTHY, | ) | |
| WEB3DIRECT, INC., CITY CAPITAL | ) | |
| CORPORATION, ERX ENERGY, LLC, JEFFREY | ) | |
| SMUDA, EQUITY TRUST COMPANY, and | ) | |
| DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiffs WILLIAM LEE, GENNET THOMPSON and TRUDY MORGAN

("Plaintiffs"), individually and on behalf of a class of similarly situated persons, bring this

action, by and through their undersigned counsel, and allege as follows:

## I.  INTRODUCTION

1.     This action arises out of an well executed, carefully crafted fraudulent scheme, in

fact, a Ponzi scheme (i.e., a fraudulent investment operation that pays returns to prior investors

from the monies paid by subsequent investors because the scheme does not actually generate

profits) of the most insidious kind orchestrated by Defendants EPHREN TAYLOR, WENDY

WCONNOR, DWAYNE CONNOR,  INFORMATION  ENTERPRISES  UNLIMITED, INC.,

SWEEPSVEND, LLC,WALDO EMERSON BRANTLEY,   DON RICARDO MCCARTHY,

WEB3DIRECT, INC., ERX ENERGY, LLC, JEFFERY  SMUDA, EQUITY TRUST

CORPORATION and CITY CAPITAL CORPORATION (described collectively herein as the "CITY CAPITAL CONSPIRATORS" or Defendants). As is typical with Ponzi schemes, the CITY CAPITAL CONSPIRATORS used incoming funds from newer investors to pay principal and interest or dividends to already existing investors and divert funds to themselves until the scheme collapsed when it ran out of new investors/ victims. However, what is atypical is that many of the CITY CAPITAL CONSPIRATORS and their agents continue these Ponzi schemes under new corporate and business names.

2.      The CITY CAPITAL CONSPIRATORS intentionally targeted and induced hundreds or thousands of innocent, working class, church-going, "socially conscious," mostly minority and African-Americans to transfer and invest their hard-earned money in Defendants' companies with a false sense of security that their money was insured, protected and invested by persons in legitimate, no risk, multi-million dollar, profitable, "leading" public and private companies with "the highest ethics," and an overriding sense of social responsibility.

3.      In fact, the CITY CAPITAL CONSPIRATORS were neither licensed nor registered to sell securities or advise on investments. The purported "investments" they offered were neither licensed nor registered. The CITY CAPITAL CONSPIRATORS failed and refused to provide any definitive financial information on the investments being offered, and sold Plaintiffs and other victims "interests" in nonexistent or failing ventures and illegal gambling operations, something the Defendants knew, but which was unknown by the hundreds or thousands of inexperienced victims/investors who comprise this Class.

4.      Defendants falsely led Plaintiffs and the other Class members to believe that their "investments" would help others less fortunate. Plaintiffs, relying on those representations, in

good faith gave their hard-earned money to the Defendants who absconded with it. Many investors lost their entire life savings as well as their 401k and IRA retirement accounts.

5.     Through an extensive fraudulent enterprise, the CITY CAPITAL CONSPIRATORS (collective also referred to as "Defendants") and other financial institutions which will subsequently be added as Defendants, stole and/or diverted millions of dollars through a pattern of racketeering involving criminal acts of wire fraud, interstate transportation of stolen property, money laundering, conspiracy and more.

6.     Plaintiffs incorporate by reference as if fully set forth herein all exhibits referenced and attached to this Complaint.

## II.   JURISDICTION AND VENUE

7.     The Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332 (d) (2) and the Class Action Fairness Act. Plaintiffs and certain Defendants are citizens of different states. The amount in controversy exceeds $5,000,000, exclusive of interest and costs.

8.     This Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. § 1965, the due process clause of the U.S. Constitution, and the North Carolina long-arm statute, N.C. Gen. Stat. § 1-75.4.24.

9.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' additional claims arising under North Carolina state law for, *inter alia*, civil conspiracy, violation of North Carolina's Racketeer Influenced and Corrupt Organizations Act, N.C.G.S. § 75D, *et seq*., and violation of North Carolina's Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1, *et seq.*

10.     Venue in this district satisfies the requirements of 28 U.S.C. §1391 (b) (1)-(2) because some Plaintiffs and Defendants reside in this jurisdiction and a substantial amount of the events and occurrences giving rise to the claim occurred in this District.

11.     Defendants, at all times material hereto, have engaged in "trade or commerce" by advertising, soliciting, offering or distributing a good or service by soliciting consumers within the definition of the North Carolina Consumer Protection Act, G.S. §75-1.1.

12.     Defendants, directly and indirectly, have made and are making use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, and the mails, in connection with the acts, transactions, practices and course of business alleged herein.

### III.   THE PARTIES

13.     Plaintiff WILLIAM LEE ("LEE") is an individual and a resident of Raleigh, North Carolina. On or about February of 2009, Plaintiff invested $160,000 into Defendants' Socially Conscious Investment Ponzi Scam as defined below.

14.     Plaintiff GENNET THOMPSON ("THOMPSON") is an individual and a resident of Delray Beach, Florida.  On or about July of 2009, THOMPSON invested $17,200 in Defendants' Socially Conscious Investment Ponzi Scam as defined below and in February of 2010, THOMPSON invested $10,500 in Defendants' Sweeps Machine Investment Ponzi Scam as defined below.

15.     Plaintiff TRUDY MORGAN ("MORGAN") is an individual and a resident of Lithonia, Georgia.  On or about MORGAN invested approximately $30,000 into the Sweeps Machine Investment Ponzi Scam as defined below orchestrated by Defendants.

16.     Defendant/Conspirator EPHREN TAYLOR a/k/a EPHREN TAYLOR II a/k/a EPHREN TAYLOR, JR. a/k/a EPHRAIM TAYLOR a/k/a EPHRAIN TAYLOR ("TAYLOR") is an individual who resided in the State of New York until July of 2011 but may be in hiding in another jurisdiction.

17.     Defendant/Conspirator WENDY CONNOR ("WCONNOR") is an individual who resides in the State of North Carolina. WCONNOR is the wife of Defendant DWAYNE CONNOR.

18.     Defendant/Conspirator DWAYNE CONNOR ("DCONNOR") is an individual who resides in the State of North Carolina. DCONNOR is the husband of Defendant WENDY CONNOR.

19.     Defendant/Conspirator INFORMATION ENTERPRISES UNLIMITED, INC. ("IEU") is a North Carolina corporation owned by WCONNOR and DCONNOR with its principal place of business it is believed in Garner, North Carolina.

20.     Defendant/Conspirator SWEEPSVEND, LLC, ("SWEEPSVEND") is a North Carolina limited liability company owned by DCONNOR and WCONNOR among others with its principal place of business in it is believed Garner, North Carolina.

21.     Defendant/Conspirator W. EMERSON BRANTLEY ("BRANTLEY") is an individual who resides in Florida.

22.     Defendant/Conspirator DON RICARDO MCCARTHY ("MCCARTHY") is an individual who resides in the State of Texas.

23.     Defendant/Conspirator WEB3DIRECT, INC. ("WEB3") is a Florida corporation with its principal place of business in Jacksonville, Florida. WEB3 is owned by Defendant BRANTLEY.

24.     Defendant/Conspirator CITY CAPITAL CORPORATION ("CITY CAPITAL")
is a Nevada corporation with its principal place of business it is believed in Chicago, Illinois.

25.     Defendant/Conspirator JEFFREY SMUDA ("SMUDA") is an individual that
resides in Tucson, Arizona.

26.     Defendant/Conspirator ERX ENERGY, LLC ("ERX") is a wholly owned
subsidiary of CITY CAPITAL and is a Nevada corporation with its principal executive offices in
Chicago, Illinois.

27.      Defendant/Conspirator EQUITY TRUST CORPORATION ("EQUITY
TRUST") is an Ohio corporation that bills itself as "the nation's leading provider of self-directed
IRAs and 401ks, with over 128,000 clients in all 50 states and close to $10 billion dollars of
retirement plan assets under administration."

28.     At all times material hereto, Defendant TAYLOR was an officer, director and
principal shareholder of Defendant CITY CAPITAL.

29.     At all times material hereto, TAYLOR served as a member of the Audit
committee for CITY CAPITAL as well as Principal Financial Officer

30.     At all times material hereto, Defendant WCONNOR was an officer, director and
shareholder of Defendant CITY CAPITAL.

31.     At all times material hereto, Defendant BRANTLEY was an officer, shareholder
and director of Defendant CITY CAPITAL up to his resignation on January 1, 2010.

32.     BRANTLEY served as member of the Audit Committee of CITY CAPITAL
2007-2008.

33.     At all times material hereto, Defendant MCCARTHY was a director and
shareholder of CITY CAPITAL up to his resignation on June 1, 2010.

34.     MCCARTHY served as a member of the Audit Committee of CITY CAPITAL from 2006-2008.

35.     SMUDA was elected Chairman and Chief Executive Officer of CITY CAPITAL on October 22, 2010 and also serves as Chief Executive Officer of ERX.

36.     At all times material hereto, IEU and SWEEPVEND were acting as alter egos of TAYLOR, DCONNOR, WCONNOR, BRANTLEY, MCCARTHY, SMUDA, ERX ENERGY, LLC and CITY CAPITAL.

## IV.   CLASS ACTION ALLEGATIONS

37.     Plaintiffs bring this action on their behalf and as a class action pursuant to Rules 23(a) & (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased any "investment" offered by Defendants from May 6, 2006 until the present day (the "Class Period") and who suffered damages as a result (the "Class").

38.     Excluded from the Class are: a. Defendants; b. members of the immediate family of each of the Defendants that are not corporate entities; c. any person who was an executive officer, employee and/or director of any Defendant during the Class Period; d. any person, firm, trust, corporation, officer, director or any other individual or entity in which any Defendant has a controlling interest or which is affiliated with any of the Defendants; e. any independent contractor of any Defendants who participated in the sales of the investment  vehicles outlined herein; and f. the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

39.     The members of the Class, purchasers of Defendants' investments during the Class Period, are so numerous that joinder of all members is impracticable. While the exact

number of Class members can only be determined by appropriate discovery, Plaintiffs believe

that the Class members total over 500 and may be in excess of 1,000.

40.     Plaintiffs' claims are typical of the claims of members of the Class. Plaintiffs and

all members of the Class sustained damages as a result of the Defendants' unlawful course of

conduct including racketeering, money laundering, fraud, negligence, conversion, breach of

fiduciary duty, and fraud and other malfeasance as specified herein.

41.     Plaintiffs will fairly and adequately protect the interest of the members of the

Class and has retained counsel competent and experienced in class action litigation. Plaintiffs

have no interests that are contrary to or in conflict with those of the members of the Class that

Plaintiffs seek to represent.

42.      A class action is superior to other methods for the fair and efficient adjudication

of this controversy. The damages suffered by individual Class members may be relatively small,

some as little as $5,000; therefore the expense and burden of individual litigation make it

virtually impossible for the Class members individually to seek redress for the wrongful conduct

alleged herein.

43.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual Class members. Among the questions

of law and fact common to the Class are:

      a.     Whether the Defendants breached legal and fiduciary duties to the

           Plaintiffs;

      b.     Whether the Defendants failed to disclose material conflicts of

           interests to the Plaintiffs;

> c. Whether the investment vehicles sold by Defendants constituted "securities" under federal and state securities law;
>
> d. Whether the members of the Class have sustained damages as a result of the misconduct complained of herein, and, if so, the appropriate measure thereof.

44. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

45. The names and addresses of the Defendants' customers and investors who purchased "investments" during the Class Period are obtainable from information in the possession of the Defendants and/or their agents. Notice can be provided to such owners via first class mail or email using techniques and a form of notice similar to those customarily used in class actions.

## V. FACTUAL ALLEGATIONS

### A. THE CREATION OF EPHREN TAYLOR'S IMAGE

46. TAYLOR has always claimed to come from humble beginnings and bragged that he started working at 12 and became a millionaire at the ripe old age of 16. Then he "retired" with his "vast fortune" but became "bored" and came back to work in 2000.

47. Beginning in 2000, TAYLOR started touting himself to the public as a "self-made millionaire at 16" by claiming that in 1998 he launched a company with a high school partner called GoFerretGo.com that became a multi-million dollar company.

48. Through repeated use of the GoFerretGo.com success story, TAYLOR was able to claim membership in the ultra exclusive "Teenage Millionaire Club."

49.	TAYLOR repeatedly claimed in books, newspapers, television interviews, emails, radio ads and You Tube videos that GoFerretGo.com had a value of $3.5 million at some point during its less than 3 year history.   However, GoFerretGo.com mysteriously dissolved in 2001.

50.	TAYLOR tirelessly told the GoFerretGo.com story to potential investors, news and TV reporters, church members, politicians, community leaders, etc. over many years in order to garner their trust and gain access to other potential investors, who would be introduced to TAYLOR through trusted members of their community, i.e., church leaders and pastors, politicians, philanthropic leaders, etc.

51.	In 2004, Defendant TAYLOR formed Christian Capital Group, LLC ("Christian Capital"), a Missouri limited liability company.  Defendant TAYLOR was the "executive trustee" of Christian Capital. Throughout his meteoric rise to fame, TAYLOR always went back to his roots, scamming mainly African-American and minority persons of faith with his investment schemes.

52.	TAYLOR targeted minority and African American persons of faith because he knew that there was an unwritten (and sometimes written) tenet imposed upon church members, particularly in African-American and Christian churches, which can best be described as "what happens in church stays in church." The tenets of many Christian religions require disputes among church members to be handled by the church through its Elders, Deacons and Minister (assuming the Minister is not involved).

53.	TAYLOR persuaded many church goers to invest in his schemes using his rags-to-riches story, the promise of "no risk" investment returns that were unheard of with any other

10

investment vehicle, and especially his promise to benefit the investors/victims' church and community with the proceeds of the investments.

54.     TAYLOR was a master at using verbal constructions to describe the investment "opportunities" he was hawking so that they sounded extremely impressive but actually were meaningless. TAYLOR used his confidence trick to take advantage of his targets' lack of investment knowledge. TAYLOR served as a "hub" for the victims recruiting and interacting with them directly in order to perpetuate the scheme.

55.     The Ponzi schemes orchestrated by the CITY CAPITAL CONSPIRATORS were particularly well planned because the "investments" of the Plaintiffs and other Class members were set up to automatically renew or "rollover" each year such that the investors could not liquidate their investments automatically at the end of the investment period and, in fact, were not even notified at the end of any investment period that they could withdraw their investment funds or" choose" to reinvest; the interest that purportedly was being earned on the investment "appeared" in the investors/victims' self-directed IRA accounts at EQUITY TRUST automatically and regardless of whether the accrued interest had actually been placed in the account.  (It had not for the majority of investors/victims).

56.     The CITY CAPITAL CONSPIRATORS kept sending out investment account statements and providing information to investors/victims showing the CITY CAPITAL investors/victims the extraordinary investment returns they were earning by keeping their money in their EQUITY TRUST self-directed IRA account thus maintaining the deception that the schemes of the CITY CAPITAL CONSPIRATORS were providing high returns.

57.     The CITY CAPITAL CONSPIRATORS indicated that the investment opportunities were limited to purchase businesses or real property and subject to a "lottery"

11

system to create incentive for the investors/victims to act quickly in order to participate and not lose the "opportunity" to invest.

58.     Investors conned by the CITY CAPITAL CONSPIRATORS would reinvest their money in these schemes because they appeared to pay a much better return than any alternative investment opportunity. At least the returns appeared much better according to their EQUITY TRUST account statements.

59.     According to a press release issued by a Missouri entity called "Christian Capital" and TAYLOR, Christian Capital was a non-profit ministry "that employs biblical principles to help individuals increase their financial resources through low-risk investment opportunities." (Ex. A). TAYLOR frequently reminded his targets that these were "once in a lifetime" opportunities and that the potential investor needed to move fast or lose their place in line for this investment "opportunity."

60.     TAYLOR in 2004 made investment presentations for the "Prosperity Fund" a/k/a Prosperity Ministries run by Christian Capital at minority and African-American churches in Michigan, North Carolina, Pennsylvania and Tennessee.  (Ex. A).

61.     Taylor at times referred to himself as a "Minister" and an "ordained Minister."

62.     Upon information and belief, TAYLOR never had any formal seminary training nor had he ever been the minister or leader of a church.

63.     To give him credibility with church members, TAYLOR made it appear in his investment presentations that the Prosperity Fund a/k/a Prosperity Ministries was affiliated with TAYLOR'S father's (also named Ephren Taylor) church where TAYLOR'S father was pastor, Johnson County Church of Christ in Missouri. However, when TAYLOR'S father and the

Johnson County Church of Christ were sued on one of TAYLOR'S investment deals gone bad-that turned out not to be true.

64.     Defendant TAYLOR advertised that participation through investment in the Prosperity Fund would help participants, many of whom were church-goers who heard TAYLOR speak at their church, learn about how to: "eliminate consumer debt without consolidation or refinancing; retire in 10 years or less; and be a part of a low-risk investment with high performances" which were also "beneficial to the financial success of the church and community." (Ex. B).

65.     TAYLOR told the potential Prosperity Fund investors that God had helped him find the perfect investment opportunity for the church and its members. This investment scam by TAYLOR was a prelude to the Socially Conscious Investment Ponzi Scam of which Plaintiffs and other Class members are victims, as discussed below.

66.     In September of 2004, TAYLOR was sued for fraud in the case of Williford et al v. Ephren Taylor, Jr. ("Williford Complaint") in Missouri both personally and as trustee of the Prosperity Ministries trust.  Also named as defendants in the suit were his wife, Meshelle Taylor, his father, (also named Ephren Taylor) and his father's church, Johnson County Church of Christ ("Johnson County Church").  (Ex. C).

67.     After this set back, rather than give up on his scams, TAYLOR decided to go bigger.

68.     TAYLOR with the help of Defendants BRANTLEY, WEB3 and MCCARTHY came up with the perfect addition to his rich, child prodigy, Christian persona.  TAYLOR began holding himself out as the "youngest African-American CEO of any publicly traded company in

13

United States history " and started preaching (literally) the concept of "socially conscious investing," a term BRANTLEY had actually created.

69.     TAYLOR started holding himself out to the public in books, newspapers, television, emails, radio ads and videos as a successful businessman overseeing $250 million dollars in assets of two publicly traded companies.

70.     An essential part of TAYLOR'S scam, as with other Ponzi schemes, was and is to make investors want to invest **in him** via his wildly successful "companies." While some of TAYLOR'S investment success "stories" and personal financial dealings may have been real, the majority of them were purely fabricated.

71.     Upon information and belief, Defendants BRANTLEY, WEB3 and MCCARTHY were instrumental in helping TAYLOR create the fictional character that TAYLOR assumed and which permitted him to bilk millions of dollars from hundreds or thousands of investors.

72.     Through numerous press releases and hundreds of speaking engagements, books, blogs, You Tube videos, radio and television commercials and interviews and public appearances, TAYLOR convinced the world that he was a "Minister," financial guru, investment wizard, multi- million dollar business manager and philanthropic rock star.

73.     A Ponzi scheme or fraudulent enterprise cannot be successful or even operate without the help of a number of individuals both inside and outside the company perpetuating the scheme. The facts will show that TAYLOR was part of a carefully orchestrated con-not a solo act.

74.     TAYLOR could not have pulled off these multiple multi-million dollar scams by himself. Plaintiffs' counsel believe that through discovery they will identify other individuals and entities that were used by the CITY CAPITAL CONSPIRATORS to promote and perpetuate the

Ponzi schemes mentioned herein so Plaintiffs have also named as defendants Does 1-10 and will identify these individuals and entities as discovery is conducted and more information is available to pursue claims against them.

### B. TAYLOR USED HIS MULTITUDE OF SHELL COMPANIES AND PUBLIC RELATIONS COHORTS TO BUILD HIS CREDIBILITY AND ENHANCE HIS REPUTATION

75.     Defendant TAYLOR from at least 2004 until 2010 maintained a personal website, www.ephren.com, which targeted minority and African-Americans and provided investment advice and information on the Prosperity Fund and other investments TAYLOR recommended to visitors to his website.

76.     The www.ephren.com website included a column written by TAYLOR called "Nine Figure Wealth" with the tag line "How to Create Wealth Beyond Six and Seven Figures." (Ex.D). The message to potential investors from TAYLOR was always if you listen to me, and invest where I tell you to invest then you will be as rich as me and just like me.

77.     TAYLOR in October of 2005 announced on his personal website, www.ephren.com, that he was working on a new stock newsletter that would permit his clients to trade the same stocks he was trading in his personal stock account. TAYLOR claimed *he was averaging on his personal stock account "a little over 3% a month.*" (Ex.E).

78.     TAYLOR owned several companies beginning with the word "Amoro." There was Amoro Corp, Amoro Management, Amoro Investments, Amoro Entertainment, etc. However, it is unclear what, if anything, any of the "Amoro" companies really did other than also take and use other people's money.

79.     The Amoro public filings are few if any, and the corporate names are interchanged frequently by TAYLOR in statements and press releases to make it difficult to

15

figure out exactly what entity TAYLOR was referring to. However, TAYLOR was able to use his "Amoro" companies to scam at least one investor.

80.     Defendant BRANTLEY also served as Chief Communications officer of AmoroCorp.

81.     On October 5, 2005, Defendant TAYLOR and his company, Amoro Investment Corporation, a Tennessee corporation, were sued in San Francisco, California (Lake Street Partners, Inc. v. Amoro Investment Corporation, et al, Case number 05-445583, Superior Court City and County of San Francisco). The complaint alleged that Defendant TAYLOR and Amoro Investment Corporation entered into two written promissory notes with the plaintiff/investor for a total of one million dollars ($1,000,000) and that TAYLOR guaranteed both notes personally. However, when Plaintiff demanded payment, TAYLOR refused. (Ex.F).  TAYLOR'S modus operandi appeared to be consistent-he borrowed money for one of his many never executed upon "development projects," gave a personal promissory note that he never intended to honor, and then absconded with the money.

82.     It is unknown whether Defendant TAYLOR and Amoro Investment Corporation ever paid the plaintiff in the Lake Street Partners case.  However, on August 27, 2007, Defendant TAYLOR'S company, Amoro Investment Corporation was administratively dissolved by the state of Tennessee.  The California "office" address TAYLOR used for Amoro and later CITY CAPITAL was nothing but a Mailboxes, Etc. store.

83.     On February 3, 2006, Defendant TAYLOR announced in a press release that Amoro Management Corp, ("Amoro Management") of which Defendant TAYLOR was founder and CEO was "chosen by Snoop Dogg to create and raise a one million dollar endowment fund for Snoop's Youth Football League ("SYFL")."  (Ex. G).

16

84.     To add credibility, TAYLOR personally donated $10,000 cash and 10,000 shares of Amoro stock (valued at approximately $12,500) to Snoop Dogg's charity.

85.     Upon information and belief, entertainer and celebrity Snoop Dog did not actually "ask" TAYLOR to manage this fund.

86.      The February 3, 2006 press release also states that "Individuals who wish to support Snoop Dogg's SYFL program can invest in the Endowment Fund and the returns from their investment will continue to fund the SYFL for decades to come."

87.     In the February 3, 2006 press release, Defendant TAYLOR stated that the *investors in Amoro Management* which "specializes in large-scale real estate development and redevelopment projects" *"are used to double and triple digit returns on their investments"* and that individuals without cash can invest with TAYLOR'S "Credit-For-Charity" program which uses their credit to make a donation. (Ex. G).

88.     The www.ephren.com website in April of 2006 stated that Amoro Management "consistently delivers" and is dedicated to generating "the highest possible return on investors' dollars" and that Amoro Management is a "Market Maker" company. (Ex.H).   However, no substantiation of those claims was ever provided by TAYLOR nor does it exist.

89.     The SEC filings (10-Q) of CITY CAPITAL for 3/31/2006 ("March 06 10Q") state that Taylor became CEO of CITY CAPITAL on May 4, 2005 (sic). (Ex. I).

90.     The March 06 10Q also states that CITY CAPITAL reported zero ($0) revenue for the first 3 months of 2006 and had an accumulated deficit of $604,219. (Ex.I).

91.     On April 19, 2006, Defendant CITY CAPITAL entered into an agreement with ECC Jazz District Acquisitions, LLC ("ECC") of which Defendant TAYLOR was owner and President under which CITY CAPITAL acquired ECC as a wholly owned subsidiary. (Ex. I).

17

However, CITY CAPITAL disposed of ECC in November of 2007 at a loss of $1,792,302. Nonetheless, TAYLOR frequently and falsely referred to the Kansas Historic District project as a multi-million-dollar development.

92.     On May 4, 2006 Defendant TAYLOR issued a press release indicating that Amoro Corporation, which was a public company dedicated to "Empowering Communities Through Socially-Conscious Development" of which Defendant TAYLOR was also founder, major shareholder and CEO, was sponsoring a social event at the Kentucky Derby. (Ex.J).

93.     The May 4, 2006 press release stated that Defendant TAYLOR was the "youngest African American CEO of any public company"  and that Amoro Corporation's  "vast development projects include Kansas City Jazz District and Cleveland's Hough District." (Ex. J). The Kansas City Jazz District is the same "vast development" project that CITY CAPITAL sold at a loss of almost $ 2 million less than 2 years after these press releases were issued and the Hough District project was given to Lucian Group as partial payment for debts owed by CITY CAPITAL. Neither project was ever profitable.

94.      An article about Defendant TAYLOR on May 21, 2006 in the Kansas City (Missouri) Business Journal ("KCBJ Article") notes TAYLOR'S "bold plan for building housing in Kansas City's urban core."  (Ex.K).

95.     However, the writer of the KCBJ Article states that it was difficult to track TAYLOR'S business activities because of the "numerous corporate entities he operates through" and that:  "Although one of his companies' Web sites describes him as lead investor for a group that manages tens of millions of dollars for people from coast to coast, *details about other members of the group or the projects mentioned on the Web pages and in news releases are sparse*."  (Ex.K).

96.     The KCBJ Article also mentions the Williford complaint filed by area investors and a contractor against TAYLOR for an earlier housing venture in which they claim they were "swindled" by TAYLOR. (Ex. K).

97.     The KCBJ article indicates that the lawsuit concerned money Taylor's companies received in 2003 for developments in Kansas City, Missouri.  One of the attorneys for the plaintiffs in that case stated that TAYLOR's company, Empire Capital Holdings LLC "bilked the investors of a combined $225,000. A contractor, Louis Garcia, contends he wasn't paid on a $25,300 construction services agreement with another of Taylor's holdings, Prosperity Ministries (a/k/a "Prosperity Fund"). (Ex. K).

98.     In addition, the KCBJ article states that TAYLOR signed promissory notes for $25,000 payable to one plaintiff and $100,000 payable to the other plaintiff and that Prosperity Ministries (a/k/a Prosperity Fund) borrowed $100,000 from one plaintiff with the promise of paying interest at an annual rate of 66 percent." (Ex. K).

99.     The KCBJ article states that the plaintiff/investors mentioned in the KCBJ article were introduced to TAYLOR through the Johnson County Church of Christ in Shawnee, Missouri where Taylor's father (named Ephren Taylor also) is the founder, minister and leader. (Ex. K).

100.     The KCBJ article also notes that TAYLOR "acknowledged that he has no comparable development experience." (Ex. K).   This case is another good example of TAYLOR'S carefully crafted schemes-use a religious connection as the method of introduction and validation of TAYLOR'S credibility, tie the investment scheme to a "socially-conscious" project which either does not exist or cannot actually be executed upon with the  financial resources available, then take the money and run, literally.

19

101.    On June 14, 2006 AmoroCorp issued a press release indicating that it had "acquired" JoMo Media Group to "dramatically expand the Company's media effectiveness and reach." The press release notes that AmoroCorp's investment products have "some of the highest rates of return in the industry." (Ex. L). TAYLOR routinely issued these press releases for all of his shell companies which appeared to tout some new development or exciting profit angle but which, when you carefully reviewed the information or lack thereof, were actually meaningless. Another typical Ponzi scheme tactic.

102.    On July 1, 2006 Defendant TAYLOR'S website, www.ephren.com, indicated that Amoro Corporation is a "publicly-held investment development group" that had the "highest rates of return in the industry." (Ex. M). In addition, TAYLOR'S website stated that Amoro Corporation's "charitable arm helps non-profits and houses of worship create ongoing revenue streams with high returns on investments." Noticeably absent from TAYLOR'S press release are any examples of actual houses of worship that benefitted from Amoro Corporation's "charitable arm." In fact, Amoro Corporation was an OTC (Over The Counter) pink sheets penny stock which was in violation of SEC and IRS reporting requirements.

103.    On July 28, 2006 Defendant TAYLOR issued a press release about the Snoop Dogg Football League and his donation of 10,000 shares of AmoroCorp stock to the League. The press release also states that TAYLOR'S companies "manage over $150 million in projects, including the famous Kansas City Historic Jazz District." (Ex. N). Again, this is the same project that CITY CAPITAL sold in 2007 at a loss of almost $ 2 million.

104.    On August 10, 2006, CITY CAPITAL announced the acquisition of ECC through a press release. (Ex. O).

105.    On August 28, 2006, Defendant CITY CAPITAL issued another press release indicating that it had outsourced all of its operations and management to AmoroCorp, Inc. (Ex. P). This was surprising since AmoroCorp did not appear to have any operations.

106.    The press release of August 28, 2006 by Defendant CITY CAPITAL further stated that AmoroCorp would receive $1.2 million annually for management of Defendant CITY CAPITAL's operations. (Ex. P).

107.    It is unknown why CITY CAPITAL would agree to pay $1.2 million to another company, particularly TAYLOR'S AmoroCorp which had no apparent management experience, to run its operations when it was already operating at a substantial loss and TAYLOR by this time had become the CEO of CITY CAPITAL. Plaintiffs believe TAYLOR used the AmoroCorp management agreement as justification to pull money out of CITY CAPITAL and put it into AmoroCorp where it was diverted to him through a contrived, unsubstantiated claim of services being rendered by AmoroCorp to CITY CAPITAL-another fraud.

108.    On October 31, 2006, Defendants TAYLOR and CITY CAPITAL issued a press release indicating that they had signed a $50 million credit facility with the Lucian Group.

(Ex .Q ). This credit facility, however, was terminated on June 13, 2007, seven (7) months later. It is very odd that the Lucian Group would offer a $50 million dollar credit line to a company that was consistently losing money, had a large debt load and little or no revenue.  Another scam perpetrated through multiple press releases and media hype.

109.    On February 2, 2007, the CITY CAPITAL CONSPIRATORS issued a press release stating that Defendant W. EMERSON BRANTLEY III had been elected to the Board of Directors of CITY CAPITAL and also named CITY CAPITAL'S Chief Communications Officer.   CITY CAPITAL'S $50 million dollar equity line with Lucian Group is also noted in

this press release. This press release further indicated that BRANTLEY had served as a business and marketing advisor to TAYLOR and CITY CAPITAL since 2006. (Ex. R).

110. On March 8, 2007, the CITY CAPITAL CONSPIRATORS issued a press release indicating that TAYLOR had been asked to host a "Soul of Success" radio talk show for Family Talk XM 170. Again CITY CAPITAL'S $50 million dollar equity line with Lucian Group is noted in this press release. (Ex. S).

111. On March 21, 2007, Defendants issued a press release about their "popular Credit-Investor Program that allows individual investors to participate in affordable housing initiatives nationwide, without using any of their own cash. The company keeps none of the rental or resale profits, and guarantees the investor's mortgage payments up to two years." This new investment opportunity was also advertised on XM-Satellite Radio. CITY CAPITAL'S $50 million dollar equity line with Lucian Group is also noted in this press release. (Ex. T). This "no money down" real estate investment opportunity was part of the Socially Conscious Investment Ponzi Scam described herein-it just involved credit as opposed to cash.

112. In the March 21, 2007 CITY CAPITAL press release, Defendant EMERSON BRANTLEY, also the Chief Communications Officer of City Capital by this time states about the "*Credit-Investor Program: "It's a win-win-win proposition. Using their good credit alone, qualified investors can purchase these properties well below market value, yet own them 100% with no money down. City Capital handles all due diligence, acquisition, repairs and property management. We do everything, the Credit –Investor does nothing and keeps the profits. We even guarantee mortgage payments for the first two years."* (Ex. T).

113. By this time, TAYLOR'S Ponzi schemes with the help of other CITY CAPITAL CONSPIRATORS were being executed daily. This press release is carefully crafted to attract the

attention of persons with no liquid assets but good credit desiring ownership in real estate

investments. The press release makes it sound like the investor/victim does nothing-invests no

money-does no work-performs no management-AND-Defendants "GUARANTEE" the

mortgage payments for 2 years.

114.    Indeed, this no money down real estate investment scam would have been a

fantastic deal if it were true but at the time this press release was issued CITY CAPITAL had

negative cash flow and a large debt load so how could CITY CAPITAL afford to provide such a

"GUARANTEE" ?  The answer, of course, is that they couldn't.

115.    As directors and members of the Audit Committee of CITY CAPITAL,

BRANTLEY, TAYLOR, WCONNOR and MCCARTHY had access to the books and records of

CITY CAPITAL and knew that CITY CAPITAL was not cash flow positive, it was not even

close to break even. There was no way CITY CAPITAL could guarantee to pay anything-not

even its own debts. Yet the press releases claiming extraordinary profitability kept right on

coming.

116.    An important part of TAYLOR'S scheme was the fact that TAYLOR always had

himself appointed the Principal Financial Officer of each publicly traded company when he

became the Chief Executive Officer of the company. TAYLOR needed to fulfill both roles so

that all financial and accounting information was controlled by him and his accomplices.

BRANTLEY and MCCARTHY clearly had no problem with that and continued to serve as

Directors of CITY CAPITAL for several years adding to TAYLOR and CITY CAPITAL'S

credibility.

117.    The CITY CAPITAL CONSPIRATORS were able to reach their targeted victims

by devising and implementing sophisticated plans targeting minority and African Americans

through television and radio ads, including Christian radio and television stations, email advertising, personal speaking engagements in communities and churches, You Tube videos, appearances on national television shows and news reports, personal meetings, blogs and websites and other devices to trick Plaintiffs and other of Defendants' victims into believing that the CITY CAPITAL CONSPIRATORS were able to use the victims' monies, including Plaintiffs WILLIAM LEE and GENNET THOMPSON and the other Class members, from self-directed IRAs, 401ks, and personal credit, credit cards and cash to purchase homes, real estate and businesses in communities with working class families and by doing so create new jobs and affordable homes in these communities while "guaranteeing" that LEE, THOMPSON and other investors would double their return on investment ("ROI") within 12 months "risk free." We refer to this scheme in this Complaint as the "Socially Conscious Investment Ponzi Scam."

118.    The CITY CAPITAL CONSPIRATORS for their "Sweeps Machine" investment scheme were able to reach their targeted victims by devising and implementing sophisticated plans targeting minority and African Americans through television and radio ads, email advertising, personal speaking engagements in communities and churches, You Tube videos, appearances on national television and radio ads, personal meetings, blogs and websites and other devices to attract and convince investors to use monies from their self-directed IRAs, 401ks, personal credit, credit cards and cash, including Plaintiff s TRUDY MORGAN, GENNET THOMPSON and other Class members, to purchase sweepstakes machines that were to be put in retail establishments around the country  with promises of a no risk, guaranteed rate of return "100% legal" gambling operation.

119.    In fact, the CITY CAPITAL CONSPIRATORS touted that the Sweeps Income sweepstakes machine investment through Clean Sweeps Holding Group, LLC was guaranteed by

TAYLOR and the other Defendants as "100% RISK-FREE" such that MORGAN and

THOMPSON were assured in writing by Defendants that if they did not recoup their initial

investment in the CITY CAPITAL CONSPIRATORS' Sweeps machines within one year or

three months (Defendants used both pitches), Defendants would return MORGAN and

THOMPSON'S investment monies. We refer to this scheme in this Complaint as the "Sweeps

Machine Investment Ponzi Scam."

  120. On May 13, 2007, TAYLOR posted an article on his Urban Wealth website

(www.urbanwealth.net) about his "The Urban Wealth Tour." The Urban Wealth Tour was an 18

city tour beginning in Columbus, Ohio where TAYLOR spoke to communities and churches

about "economic empowerment" and "investment opportunities." (Ex. U).

  121. These Urban Wealth tours permitted TAYLOR and the other CITY CAPITAL

CONSPIRATORS to take their Ponzi schemes to a national level by convincing civic and

religious leaders to permit TAYLOR to speak at a scheduled event and give TAYLOR access to

their members and participants.

  122. The Urban Wealth tour is a good example of TAYLOR "hiding in public" to

avoid detection of his scams and generate credibility for the investment Ponzi schemes he was

promoting-who would suspect that a scam was being perpetrated by a person repeatedly

announcing on every media, marketing and advertising medium available that he would be

travelling to their city to explain how to achieve financial success and discussing his life as a

"Minister", real estate mogul and investment tycoon? The answer is, of course, apparently no

one.

123.     On June 13, 2007, CITY CAPITAL issued a press release announcing the termination of the Lucian Group $50 million credit facility after 7 months.  No explanation was given.  (Ex. V).

124.     On July 13, 2007, AmoroCorp issued a press release indicating that because of its size (revenue) and number of shareholder it was no longer required to register as an SEC reporting company.  (Ex. W). Although the "spin" TAYLOR put on this press release was positive, the reality was that AmoroCorp had minimal revenue, no assets or shareholders because it was not a real business and had no value. AmoroCorp was just another entity in TAYLOR'S corporate shell game.

125.     The truth was that on July 6, 2007 the SEC had revoked the registration of securities for AmoroCorp for failure to make required periodic filings. It is believed that TAYLOR deliberately failed to make the required SEC periodic filings so that no one could ascertain the actual financial status of AmoroCorp by reviewing its publicly filed financial statements. AmoroCorp was just another vehicle used by TAYLOR in his Ponzi schemes to appear credible.

126.     On August 30, 2007, CITY CAPITAL issued a press release indicating that Goshen Energy Resources, Inc., a wholly owned subsidiary of CITY CAPITAL, was entering the bio-energy arena.  The press release further states that: "CITY CAPITAL is in discussions to build five regional hubs for distribution of our B100 biodiesel fuel over the next 24 months." (Ex. X). There is no evidence this project ever moved forward beyond the issuance of this press release.  This is another example of the CITY CAPITAL CONSPIRATORS creating the impression through media hype and press releases that CITY CAPITAL was a real business to

attract inexperienced investors. Goshen in fact went out of business in July of 2007 after failing to make a payment necessary to continue its purchase of an oil and gas lease.

127.     In the August 30, 2007 press release, TAYLOR stated: *"We've increasingly become concerned that our existing real estate model was vulnerable to recent changes in the market. We chose to be proactive, to eliminate existing real estate debt."* The press release also indicates that Lucian Development LLC "contracted to acquire the majority of CITY CAPITAL's real estate holdings eliminating over $4,000,000 of liability." (Ex. X). As indicated herein, the truth was CITY CAPITAL owed Lucian money and Lucian took the debt instruments as partial payment by CITY CAPITAL.

128.     Sometime in mid 2007, CITY CAPITAL started using a Tennessee business address. But the address was really a UPS store.

129.     But the question remained-where were the money and assets of CITY CAPITAL that the CITY CAPITAL CONSPIRATORS keep talking about in the multitude of press releases that the CITY CAPITAL CONSPIRATORS keep pumping out?

130.     And why in 2008 would the CITY CAPITAL CONSPIRATORS decide that real estate investing through a self-directed IRA was a good idea for investors like the Plaintiffs and other Class members when CITY CAPITAL had just exited the real estate market at a loss? Well, because that was the way the CITY CAPITAL CONSPIRATORS were going to make a lot of money.

131.     In mid-2007 and beyond, TAYLOR'S carefully created persona gained national media attention. The EPHREN TAYLOR rags to riches story became the "feel good" story of 2007 and even 2008 and TAYLOR was soon in the national spotlight, exactly as TAYLOR, BRANTLEY, WEB3, and MCCARTHY had planned.

132.     TAYLOR appeared on 20/20, The Today Show, the Montel Williams Show, Fox News, CNBC, and on Christian television and radio shows.

133.     TAYLOR was asked to be a commentator on news and financial television shows and radio broadcast. All of this exposure and publicity did nothing but add to TAYLOR'S credibility with the public and particularly the African-American Christian community.

## C.  EQUITY TRUST IS AN ESSENTIAL PART OF DEFENDANTS' PONZI SCHEMES

134.     One of the distinguishing factors in this case is that the CITY CAPITAL CONSPIRATORS, both individuals and businesses, enjoyed a close, unique partnership.  There were no arms length transactions among these Defendants.  The lack of formalities and structure of the business relationships of the CITY CAPITAL CONSPIRATORS is most clearly demonstrated by the marketing  and investment solicitation joint venture of CITY CAPITAL and EQUITY TRUST.

135.     In all respects, the procurement of investments from victims, including the Plaintiffs, in CITY CAPITAL through self-directed IRAs,  resulted from a well organized, long standing joint venture between TAYLOR, CITY CAPITAL, WCONNOR, DCONNOR, BRANTLEY, MCCARTHY,  and EQUITY TRUST.

136.     The CITY CAPITAL CONSPIRATORS were locked arm in arm as they advertised and promoted nationally their close working relationship. In fact, they went so far as to state that CITY CAPITAL both "controlled the investments" transferred to EQUITY TRUST and worked "directly" with EQUITY TRUST.  So who was protecting the interests of Plaintiffs and other Class members who gave their money to EQUITY TRUST? Simply put, absolutely no one.

137.    More importantly, EQUITY TRUST gave TAYLOR, CITY CAPITAL, BRANTLEY, WEB3, MCCARTHY, DCONNOR and WCONNOR credibility in the market place as legitimate business persons and entities.

138.    In addition, TAYLOR, CITY CAPITAL, BRANTLEY, WEB3, MCCARTHY and WCONNOR all illegally controlled the CITY CAPITAL investment monies, belonging to Plaintiffs and other Class members, in EQUITY TRUST.

139.    EQUITY TRUST viewed and treated CITY CAPITAL as their partner and client, not the Plaintiffs and other Class members, which is why when the money ran out and the Ponzi scheme crumbled, EQUITY TRUST refused to assist the Plaintiffs and other Class members in trying to understand what happened to their investment money and where their money had been invested. After all, it was CITY CAPITAL who was paying the EQUITY TRUST fees for the CITY CAPITAL "investments".

140.    Defendants BRANTLEY, WEB 3, MCCARTHY, TAYLOR and CITY CAPITAL put together several marketing brochures, booklets, etc. advertising "investments" through self-directed IRAs, real estate investing, oil and gas investing, etc.  These documents were distributed to potential investors nationwide.  Defendant EQUITY TRUST is specifically listed in the CITY CAPITAL documents as the ONLY company that manages self-directed IRAs for CITY CAPITAL as detailed in the document provided to potential investors and titled "Ephren's TOP Resources" for investors. (Ex. CCCCC).

141.    Also prominent on TAYLOR'S "Top Resources" list for investors is the name and contact information for Robert Batt who served as the sole liaison between EQUITY TRUST and investors of CITY CAPITAL. (Ex. CCCCC).

142.     Batt was introduced to the Plaintiffs and other Class members as TAYLOR'S personal investment banker.  Batt gave TAYLOR another layer of credibility through his position as an agent/employee of EQUITY TRUST and established TAYLOR as an affluent investment advisor.

143.     TAYLOR frequently emphasized EQUITY TRUST's size and experience as a self-directed IRA custodian as further evidence of the strength of the CITY CAPITAL team and used the EQUITY TRUST name to add credibility to the investment schemes the CITY CAPITAL CONSPIRATORS were constantly pumping in press releases and other media.

144.     But the relationship between TAYLOR, CITY CAPITAL and EQUITY TRUST went beyond the CITY CAPITAL investment scams.

145.     EQUITY TRUST was, in fact, a supporter of TAYLOR and CITY CAPITAL, literally.

146.     In March of 2007, TAYLOR spoke at a seminar "aimed at investors" in the British Virgin Islands regarding City Capital and its focus on making loans and equity investments in developing businesses.

147.     EQUITY TRUST was a sponsor of the seminar and underwrote some of the costs. (Ex. DDDDD).  Nothing says validation louder than having someone pay to sponsor your speaking engagement. Particularly if the purpose of the speaking engagement is to entice more investors to put their money in self-directed IRAs which would benefit EQUITY TRUST.

148.     TAYLOR referred to EQUITY TRUST in an interview in December of 2008. TAYLOR indicated that CITY CAPITAL "uses" EQUITY TRUST as a custodial firm and "runs the business for the client." (Ex. EEEEE). But wasn't the purpose of a self-directed IRA to

permit the investors to gain control and direct their investments? Not, of course, if you are scamming the investor.

149. But perhaps the best example of TAYLOR "pumping" EQUITY TRUST, was the article he wrote lavishly praising and shamelessly promoting EQUITY TRUST. (Ex. FFFFF).

150. In this article, TAYLOR indicates that EQUITY TRUST is "up there among the best" as a self-directed IRA custodian. How TAYLOR would know EQUITY TRUST was the "best" remains a mystery since he had not ever used another self-directed IRA custodian in any of his businesses at the time of the article.

151. TAYLOR touts EQUITY TRUST as a company with "170 highly trained specialists to serve their clients from all over the United States, managing around $3 billion in IRA assets." (Ex. FFFFF).

152. TAYLOR claimed in the article that EQUITY TRUST had the fastest turnaround response time in the industry but cites no actual proof of that. (Ex. FFFFF).

153. TAYLOR even commented on how low EQUITY TRUST'S fees are and that EQUITY TRUST did not charge transaction fees.

154. However, as alleged in this Complaint, the Plaintiffs and other Class members were overcharged by EQUITY TRUST repeatedly and were never able to obtain a refund of those overcharges.

155. TAYLOR clearly did not want his potential "clients" to go to a third party custodian, so he had to make EQUITY TRUST look far superior to its competitors.

156. TAYLOR closes the article with the following statement: "Self-directed IRA's place enough responsibility on the account holder as it is. EQUITY TRUST Company is there to make things as easy and simple as possible, providing clients with professional advisers to help

maintain accounts yet charge the lowest prices, without sacrificing the level of service and satisfaction of the client." (Ex. FFFFF).

157.    TAYLOR'S statement about the responsibility of the account holder of a self-directed IRA as burdensome is in direct contrast to other statements TAYLOR made and that are contained in this Complaint indicating that TAYLOR marketed the CITY CAPITAL investment vehicles to potential investors as a seamless way to invest while having to do nothing other than create the self-directed IRA and transfer the money to EQUITY TRUST.  TAYLOR kept emphasizing in other interviews and articles as well as blogs that the "ease" of investing in CITY CAPITAL as "hassle free" was a major advantage because CITY CAPITAL managed and controlled the investment.  (Ex. GGGGG).

158.    The CITY CAPITAL CONSPIRATORS kept a tight control over the direction of investments and creation of self-directed IRAs to EQUITY TRUST.  The CITY CAPITAL CONSPIRATORS wanted to make sure they controlled the investment, the communications with CITY CAPITAL investors such as Plaintiffs and the other Class members so that no suspicions were aroused.

159.    Upon information and belief, CITY CAPITAL and its progeny starting defaulting on its loans and notes from other investments as early as mid-2008.  Therefore, EQUITY TRUST must have known there was a serious problem with these investments when CITY CAPITAL kept defaulting on hundreds of promissory notes repeatedly over multiple years.

160.    On December 21, 2007, a You Tube video was uploaded.  The speaker was Carl Varchetti, who at the time appeared to be some kind of IT consultant at a law firm in Missouri. It is unknown how he knew TAYLOR and BRANTLEY.

161.     Varchetti indicated he owned the website www.cashfreeinvesting.com and was, he claimed, a partner of TAYLOR and CITY CAPITAL.  Varchetti was also touting the Socially Conscious Investment Ponzi Scam and through an 800 number on the screen of the video, the viewer was able to get information on "applying" as a "Credit" investor.

162.     The Credit-Investor Package  included a Power of Attorney which gave CITY CAPITAL the right to purchase property in the name of the investor, sell real or personal property of the investor, execute deeds, mortgages, releases, satisfactions ,etc. for real or personal property which "said attorney considers necessary or in my best interests."

163.     The power of attorney prepared by the CITY CAPITAL CONSPIRATORS and required to be signed by investors states that it is effective and exercisable by CITY CAPITAL "notwithstanding" the investor's "disability, incapacity or in the event of any later uncertainty as to whether I am dead or alive."  In addition, the investor had to give CITY CAPITAL 12 months notice to terminate it. (Composite Exhibit YYY). CITY CAPITAL through the Credit Investor program obtained complete control over the investment and investment property of their innocent victims.

164.     As of December 31, 2007, CITY CAPITAL had less than $100,000 in cash and AmoroCorp owed CITY CAPITAL $2,131,780.  In addition, CITY CAPITAL was in default on one of its notes payable with a principal of $250,000 and accrued interest of $475,683. Also as of this time, CITY CAPITAL had not filed its 2005 or 2006 tax returns (City Capital 10KSB dated 5/1/2008).

165.     On January 4, 2008, Defendant TAYLOR gave an interview about CITY CAPITAL.  TAYLOR noted that CITY CAPITAL had completed selling off "City Capital Rehabilitation, ECC and the Credit-Investor program to Lucian Development." (Ex. Z).

TAYLOR made no mention of CITY CAPITAL actually receiving any compensation for these programs.

166.    Indeed, the truth was that Lucian Group, a New York corporation, had taken assignment from CITY CAPITAL of promissory notes with an aggregate principal amount of $4,478,000 as well as transfer of 100% of CITY CAPITAL'S ownership interests in three limited liability companies and common stock from CITY CAPITAL. It appears this transaction was consummated to repay Lucian for monies borrowed by CITY CAPITAL on its short-lived, highly publicized $50 million credit line with Lucian.

167.    In 2008  TAYLOR, BRANTLEY, MCCARTHY and CITY CAPITAL first issued the 3 Simple Steps solicitation referred to in the Thompson complaint referred to later herein and which continued to be issued through the CITY CAPITAL CONSPIRATORS.

168.    EQUITY TRUST was prominently mentioned throughout the 3 Simple Steps document and the CITY CAPITAL CONSPIRATORS falsely indicated that Plaintiffs' and the other Class members' self-directed IRA deposits were insured by the FDIC for up to $250,000. In fact, only cash deposits were insured by the FDIC.

169.    3 Simple Steps states on page 49 that if the investors/victims choose EQUITY TRUST "All Your Fees are Pre-Paid by City Capital."  This was done to make sure that all CITY CAPITAL investors used EQUITY TRUST so that the CITY CAPITAL CONSPIRATORS could control both the money and the information provided to investors about their self-directed IRAs and investment values. Didn't EQUITY TRUST know that such payments by CITY CAPITAL were illegal?

170.    Defendant TAYLOR also said in a January 4, 2008 interview that his goal was to have CITY CAPITAL attain profitability by the third quarter of 2008. (Ex. Z).

34

171. In March of 2008, Defendants maintained a website called www.iracashflow.com. This website had articles on the investment of funds in self- directing IRAs through CITY CAPITAL. The website stated: "Whatever your IRA earned in the last calendar year, City Capital will guarantee to Double Your ROI within the next 12 months (emphasis in original). *You can become involved in creating affordable homes for working-class families…the only real estate market with a 15-year backlog of demand. Automatic resales are assured, with 100s of ready, prequalified buyers, waiting to buy as many properties as allowed. Absolutely Hassle-Free, Worry-Free, Hands-Free Investing, With Guaranteed ROI.*" (Ex. AA). All of the CITY CAPITAL CONSPIRATORS were aware that CITY CAPITAL had already started selling off its real estate "assets" at a loss.

172. Also in March of 2008, Defendant BRANTLEY made a You Tube video for CITY CAPITAL touting socially conscious cash free investing in partnership with "WebEquityBank." Upon information and belief, WebEquityBank never existed as a real bank but was just part of the CITY CAPITAL CONSPIRATORS' scheme to make their investment pitches look legitimate. (Ex.ZZZ). This same BRANTLEY video could be found on the www.cashfreeinvesting.com website at least until May of 2009.

173. BRANTLEY, WEB3, MCCARTHY and TAYLOR drafted the written materials given to potential CITY CAPITAL investors on the self-directed IRA/401k investor programs. (Ex. AAAA).

174. In April of 2008, Defendant Taylor's blog, www.ephren.com, contained a comment by TAYLOR that he was relocating to New York City. TAYLOR indicated that he was "opening a new CITY CAPITAL office around wall street." (Ex. BB).

175.    That "Wall Street" office address turned out to be a "virtual office" i.e., simply rental of an address not a real physical location.

176.    On December 8, 2008, TAYLOR, CITY CAPITAL, AmoroCorp, Ephren Capital Corporation, Escrow Express, LLC, Amoro Management Group LLC, and Own the Pond, LLC were sued in Kansas Federal District Court for securities fraud.  Plaintiff claimed damages of $150,000. (Escalada et al v. Taylor et al, Case number 6:2008cv1379, Sedgwick, Kansas).  CITY CAPITAL was dismissed from the action in April of 2009.

177.    Own the Pond, LLC ("Own the Pond") was another TAYLOR investment company.  Own the Pond was purportedly a well-established organization with 75+ years of combined experience and wisdom.  In fact, Own the Pond touted TAYLOR as "a unique private asset manager" known for producing "millions in profits for his clients and that TAYLOR'S average client generates over 30% annually." (Ex. CCCC ).

178.    There is no evidence that TAYLOR ever generated any kind of "profit" for any of his "clients."  In fact, TAYLOR never had a license as a securities broker or dealer or any investment training and therefore was illegally providing investment advice.

179.    In August of 2008, TAYLOR spoke at the Democratic National Convention to the Young Leader's Summitt on his "socially conscious" corporate investment strategy. TAYLOR was fortunate to be riding the wave of popularity of young, black, successful men created by then U.S.  presidential candidate Barrack Obama.

180.    At the same time, TAYLOR and the other CITY CAPITAL CONSPIRATORS were touting TAYLOR'S self-directed IRA cash flow program through CITY CAPITAL with "GUARANTEED DOUBLE ROI" at that time processed solely through Defendant EQUITY TRUST. (Ex. DDDDD).

36

181.    In January of 2009, the CITY CAPITAL CONSPIRATORS maintained a
website, www.iracashflow.com, that provided information on investing in businesses that the
CITY CAPITAL CONSPIRATORS were involved in through self-directed IRAs.   Viewers of
the website were encouraged to invest with one of the CITY CAPITAL investment funds and
utilize their IRA and retirement funds to purchase a business. The caption of the article states
"**Guaranteed Double ROI-With Socially-Conscious Investing"** (with emphasis in original.)
(Ex. CC).

182.    The CITY CAPITAL CONSPIRATORS maintained an 800 number for
www.iracashflow.com and www.citycapcorp.com where telemarketing sales reps sold self-
directed IRA investment vehicles.  All of the sales reps were paid on a commission basis only.

183.    On February 1, 2009, Defendant TAYLOR noted on his blog, www. ephren.com,
that he had a "few thousand" readers between his blog, Twitter, Facebook account and other web
feeds.  (Ex. DD).

184.    TAYLOR and the other Defendants used the Internet to facilitate fraudulent
schemes by continually repeating the story of  TAYLOR'S  meteoric rise, national television
interviews and increasing wealth as well as the success of his many business ventures. This was
another method used by  the CITY CAPITAL CONSPIRATORS to falsely perpetuate the notion
that TAYLOR and his companies and investments were wildly profitable and successful.

185.    On February 6, 2009, the CITY CAPITAL CONSPIRATORS issued a press
release titled "MINISTER EPHREN TAYOR OFFERS ECONOMIC STIMULUS PROGRAM
TO GROW CHURCHES IN FINANCIAL NEED."  This press release describes Defendants'
scheme to attract church-goers and members as investors in the CITY CAPITAL
CONSPIRATORS' Ponzi schemes.  The article notes that "*Taylor is not only an enterprising*

*entrepreneur but also a devoted minister who has made it his mission to not only give back, but*

*alto (sic)to pay it forward with a web site, Stewardshipcrisis.com (www.stewardeshipcrisis.com)*

*dedicated to helping churches increase their stewardship amide (sic) the current economic*

*crisis."*

186.     This scheme could be called the "Socially Conscious Investment Ponzi Scam for

Members of Churches and Religious Organizations."

187.     Defendants use the same pitch for this Ponzi scheme but with a religious fervor:

> *City CAPITAL also offers a unique stewardship seminar that focuses on Christian*
> *conscious investing by using "The Celerity Plan." The plan is a self-directed IRA*
> *model that is used as the vehicle to increase wealth and financial capacity. This*
> *model has a dual benefit for the congregation and congregants. It allows the*
> *congregants to increase their personal wealth and their capacity to give to the*
> *ministry. As a socially conscious/civic responsible organization, CITY CAPITAL was*
> *established on the belief that cooperative economics is the cornerstone for building*
> *strong communities. CITY CAPITAL has a consistent track record of building value-*
> *driven investments for clients representing Christian principles and cooperative*
> *economic advancement.*

(Ex. DDDD).

188.     On March 3, 2009, Defendant TAYLOR did an interview with a writer for

forbes.com (www.forbes.com). The story centered on TAYLOR'S early success in business and

again repeated the story about TAYLOR becoming a millionaire at 16. The story noted that

TAYLOR was CEO of Defendant CITY CAPITAL "*which invests in urban revitalization*

*projects and oil wells.*" (Ex. EE).

189.     In fact, CITY CAPITAL had lost the rights to lease of the oil and gas property it

had purchased in 2007 because it did not make the July 2007 payment. At the time this press

release was issued, CITY CAPITAL had no "oil wells" or other oil and gas related investments.

(See CITY CAPITAL 2007 10KSB SEC filing dated May 1, 2008).

38

190.    However, the March 3, 2009 article further states:  "His touch (TAYLOR) has been less than golden there (at CITY CAPITAL): For the trailing 12 months ended last September ( September of 2008) the company (Defendant CITY CAPITAL) lost $2.9 million on sales of $305,000.  (Ex. EE).

191.    In order for TAYLOR and the other CITY CAPITAL CONSPIRATORS to keep up the façade that CITY CAPITAL was profitable and that the CITY CAPITAL investments were sound, they came up with a new investment scam to support their Ponzi schemes and pay off old investors with the funds received from new "investments."

192.    The forbes.com article also indicated that TAYLOR delivers as many as 70 speeches a year at a cost of $8,000 each.  (Ex. EE). These speeches were another way for TAYLOR and the CITY CAPITAL CONSPIRATORS to get access to new victims for their fraudulent investment schemes.

193.    On May 29, 2009, Defendants issued a press release stating that TAYLOR was launching the third annual Urban Wealth Tour on June 1, 2009.The article further states that TAYLOR "leads CITY CAPITAL as CEO where he oversees *millions in assets* and engineers countless strategic business initiatives including the recent launch of a bio-fuel subsidiary for the company." (Ex. FF).

194.    Upon information and belief, the closest CITY CAPITAL came to having a real "bio-fuel" subsidiary was when they purchased a gas station in New York that eventually and mysteriously went out of business after it was sold to several CITY CAPITAL investors. But even then CITY CAPITAL didn't purchase anything-the funds for the purchase of the gas station came from investors such as the Plaintiffs.

39

195.    On June 11, 2009, Defendants' website, www.iracashflow.com, contained the following caption: "***Wake up your IRA! Put it to work and get DOUBLE the returns!*** (Ex. GG).

196.    On January 4, 2010, Defendant TAYLOR'S website, www.ephren.com, lists several investment programs Defendant TAYLOR is advocating:  "Stewardship Crisis-The Churches Economic Stimulus Program-Helping show you the way, *Minister* Ephren Taylor will provide your church or ministry with the tools to prosper." (emphasis supplied); "Join Me This Weekend-The Wealth Summit Live-Make the quality of your life better right now.  Begin today."   And "Make Money and Build Wealth with Ephren Taylor-The Social Capitalist-Making money and building wealth for a new generation.  Focusing on Social Entrepreneurship."(Ex. HH).  TAYLOR never steered far from his initial con and scheme-he continually went back to courting mainly minority and African American investors who were involved in the ministry or church.

### D.   THE SWEEPS MACHINE INVESTMENT PONZI SCAM

197.    On January 7, 2010, Defendants uploaded a video to YouTube about a *"Sweep Income RISK-FREE Investment Opportunity" and stated that "Sweep income (http://www.sweepincome.com) is an AMAZING RISK-FREE opportunity brought to you by a self-made millionaire. This investment is 100% RISK-FREE, meaning that if you don't make your money back within 1 year, you will be given your money back*!"  (emphasis supplied) (Ex. II).

198.    The Sweeps Machine Investment Ponzi Scam went public at this time, although TAYLOR was doing presentations to churches in 2009 about the sweepstakes machines and mentioning the new 100% legal investment opportunity he would be launching soon. In fact the

CITY CAPITAL CONSPIRATORS had already formed the Clean Sweep companies by the beginning of 2010.

199.   On February 24, 2010, Defendants issued a press release announcing the launch of Clean Sweeps Holdings, LLC ("Clean Sweeps"), a wholly owned subsidiary of CITY CAPITAL, which was going to "build a network of interactive charitable fundraising kiosks on the global stage." This business was headquartered in Garner, North Carolina.  (Ex. JJ).

200.   By this time, TAYLOR began referring to himself as a "celebrity"  when soliciting investors with a proven management team with several years of experience in the sweepstakes business and other retail operations.

201.   The CITY CAPITAL CONSPIRATORS took proactive measures to assure they would not be caught in this latest Ponzi scheme.

202.   For example, the employees working for Clean Sweeps only had 25 MB of storage for their emails.  They could barely retain 10 emails at a time. Plaintiffs believe this was done on purpose to prevent retention of evidence that could be used against the CITY CAPITAL CONSPIRATORS if the Sweeps Machine Investment Ponzi Scam was finally exposed.

203.   Defendant SWEEPSVEND purchased the Clean Sweeps machines for the Sweeps Machine Investment Ponzi Scam.  That is to say, that Defendant SWEEPSVEND purchased some Sweeps Machines.  Upon information and belief, less than 30% of the Sweeps Machines that investors "purchased" were actually bought by the CITY CAPITAL CONSPIRATORS

204.   Defendant IEU processed financial transactions through credit card merchant accounts for the Sweeps Machine Investment Ponzi Scam.

205.    The Clean Sweeps Machine Investment Ponzi Scam operated through the corporate entities: IEU, SWEEPSVEND, CITY CAPITAL and others as a highly organized money laundering operation.

206.    Monies that flowed through the CITY CAPITAL, IEU, SWEEPVEND and other CITY CAPITAL affiliated company accounts were diverted to third party accounts to avoid detection and hide the transactions making them appear unrelated to the fraudulent schemes of the CITY CAPITAL CONSPIRATORS. (Ex. MMMMM).

207.    The money for an investment in the Clean Sweeps machines would come in to a Clean Sweeps Bank of America account (Account number 237018134155) controlled by the CAPITAL CITY CONSPIRATORS from either: i. EQUITY TRUST for self-directed IRA investments or 401k transfers; ii.  credit card payments which were processed for CITY CAPITAL through IEU; or  iii.  cash payments paid to a Bank of America Clean Sweeps account ("Sweeps Monies").

208.    Then the Sweeps Monies would be moved by the CITY CAPITAL CONSPIRATORS from the Sweeps Monies account to an account owned by SWEEPSVEND or from the IEU account or IEU credit card merchant account to the SWEEPSVEND account controlled by the CITY CAPITAL CONSPIRATORS through DCONNOR.

209.    Johnny Ferguson ("Ferguson"), an employee of IEU, was directly responsible for credit card processing and other banking transactions conducted through the IEU merchant accounts.  It is unknown how much IEU and SWEEPSVEND were being paid for their participation in the scheme.

210.     Once the Sweeps Monies were deposited in the SWEEPSVEND account,

DCONNOR or other IEU employees would forward the money from their account to other

personal and corporate bank accounts of the CITY CAPITAL CONSPIRATORS.

211.     Upon information and belief, in some instances monies from the IEU  account

were distributed directly to other personal and corporate bank accounts of the CITY CAPITAL

CONSPIRATORS.

212.     During 2010, the multiple bank accounts owned by the CITY CAPITAL

CONSPIRATORS amassed deposits in the millions of dollars from thousands of individual

transactions.

213.     The CITY CAPITAL CONSPIRATORS opened another Bank of America

account which was used to permit investors in the continuing Ponzi scheme to deposit monies for

purchases of Sweeps Machines directly into another bank account. The new Bank of America

account ends in 5978.  Attached to this *Complaint* is a receipt dated 4/1/2011 verifying a deposit

made into the Bank of America account to purchase a sweepstakes machine.  (Ex. LLLLL).

214.     The IEU merchant accounts for purchase of Clean Sweeps machines were finally

shut down for suspicious activity in October of 2010.  However, this was too late to stop the

Defendants from stealing Plaintiffs' and other Class members' hard-earned money.

215.     Nonetheless, the Clean Sweeps Machine Investment Ponzi Scheme continued to

operate through other corporate entities even after CITY CAPITAL shut down its operations in

Raleigh in October of 2010. SMUDA took over as Chairman and Chief Executive Officer of

CITY CAPITAL on October 21, 2010 and continued to take in investment monies.

216.     After the Clean Sweeps office in Raleigh shut down, victim/investor's monies were diverted to other businesses and bank accounts controlled by the CITY CAPITAL CONSPIRATORS.

217.     Specifically, Sweepspot Consulting Services ("Sweepspot") contacted several of the "investors" after CITY CAPITAL shut down its Raleigh operations and advised them that Sweepspot was now placing their sweepstakes machines in other stores. (Ex. KKKKK). How was that possible since CITY CAPITAL had indicated it had exited the Clean Sweeps business? And where did Sweepspot get the contact information for all of the CITY CAPITAL sweepstakes machine investors?

218.     In addition, Global Sweepstakes and Investment Properties LLC and  SweepTech Capital, Inc. through their website, www.sweeptechcapital.com,  and former CITY CAPITAL employee, Keith McRae, and other former CITY CAPITAL employees operating at the direction of  TAYLOR and others, continue to process cash sales and credit card transactions for CITY CAPITAL "investors" who had not consummated their transaction at the time the Clean Sweeps operation was shut down in October of 2011 and solicited new investors for a continuation of the Sweeps Machine Investment Ponzi Scam. The Clean Sweeps Investment Ponzi Scam simply continues under new corporate names.

219.     A February 24, 2010 press release provides a convoluted description of  the Clean Sweeps program to make it sound very sophisticated. The release stated that Clean Sweeps "currently leverages innovative gaming technology to assist retail merchants in increasing revenue while assisting charities with raising much needed financial resources during these tough economic times."  The article further states that the Clean Sweeps software "is an interactive suite of video games that allows merchants to run their own private sweepstakes to incentivize

customers to spend more in their retail locations. When consumers purchase the promoted items, a portion of those proceeds helps to raise financial resources for selected charities. The company earns revenue from managing the software and hardware solutions on a subscription and percentage basis." (Ex. JJ).

220.     Defendants maintained an 800 number for www.sweepincome.com and www.citycapcorp.com where telemarketing sales reps illegally operated a "telephone room" where they sold Sweeps machines as an investment which could be purchased through the client's self-directed IRA, with credit cards or with cash. The sales reps were paid on a commission basis only.

221.     Investors who had already "qualified" for the Socially Conscious Investment Ponzi Scam were also "qualified" to apply for the Sweeps Machine Investment Ponzi Scam. Indeed many investors invested in both of the schemes with no idea that neither was a legal, legitimate investment opportunity.

222.     In addition, the CITY CAPITAL CONSPIRATORS initiated thousands of "Robocalls" ( A Robocall is a term for an automated phone call that uses both a computerized autodialer and a computer-delivered pre-recorded message) to prior and current investors to attempt to sell them Clean Sweeps machines.

223.     On February 26, 2010, Defendants issued a press release announcing a strategic partnership with S & M Consulting in West Palm Beach, Florida. The press release indicates that S & M Consulting committed to purchase $1.8 million in hardware and software from Clean Sweeps. *The release also states that S & M "agrees to pay a minimum of 30% to 40% residuals on all revenue generated by the units as long as the machines are operational."* (Ex. KK).

45

224.     There is no evidence that this particular business deal ever materialized and Plaintiffs believe this is another example of TAYLOR and the other CITY CAPITAL CONSPIRATORS working in concert with third parties to perpetuate these Ponzi schemes and frauds.

225.     Potential investors were also provided with a document, prepared by the CITY CAPITAL CONSPIRATORS titled "HOW YOU CAN CREATE A ZERO-MAINTENANCE, RESIDUAL INCOME USING THE SWEEPSTAKES EMPIRE!" (Ex. HHHHH).

226.     This marketing document states that the sweepstakes machines are in "NO WAY" affiliated with gambling and that each machine is generating $1260 per month in net income. (Ex. HHHHH).

227.     The Sweeps Machine Investment Ponzi Scam victims including MORGAN, THOMPSON and other Class members were assured that they were teaming up with a "self-made millionaire that has proven track record of success." However, as we know now, nothing could have been further from the truth. (Ex. HHHHH).

228.     And to make sure the potential investors were not suspicious or concerned about the legitimacy or profitability of the Clean Sweeps program, the CITY CAPITAL CONSPIRATORS offered a "100% risk-free, money-back assurance" and did all their banking with Bank of America to provide additional credibility to the scheme!

229.     The problem was, as the CITY CAPITAL CONSPIRATORS knew, there were no funds available to return to an investor who claimed return of their monies pursuant to this guarantee unless the CITY CAPITAL CONSPIRATORS continued to sell Clean Sweeps machines since the venture losing money (Ex. HHHHH).

230.     On May 27, 2010, Defendants issued a press release announcing the expansion of Clean Sweeps into the state of Virginia.  The press release indicates that a Clean Sweeps facility was scheduled to be ready for operation on July 1, 2010. The press release further indicates that there were Clean Sweep facilities in North Carolina, Florida and Texas. (Ex. LL).

231.     Also in May of 2010, the CITY CAPITAL CONSPIRATORS were telling potential investors in the Clean Sweeps scam that CITY CAPITAL had been in the sweepstakes machine business for 3 years, had over 100 locations, 3,000 machines and that 20% of the proceeds of the sweepstakes machines went to charity.  None of these statements were true.

232.     The CITY CAPITAL CONSPIRATORS even claimed that they were being "paid" to open up new sweepstakes stores and that they had generated over $1.2 million in capital from investors in just 4 months. Again these statements were not true.

233.     The CITY CAPITAL CONSPIRATORS shamelessly advertised that the 20% charity donation from the Clean Sweeps machine profits was going to a summer camp for terminally ill teens in Texas.  The CITY CAPITAL CONSPIRATORS were referring to the Skybound Ranch in Texas which provides camps for terminally ill children and teens. Unbelievably, this charity never received this money despite the CITY CAPITAL CONSPIRATORS' claims to the contrary.

234.     On June 1, 2010, Defendants issued a press release announcing that Clean Sweeps had added three additional sweepstakes gaming center locations in Rolesville, Walnut Cove and Kernersville, North Carolina. (Ex.MM ).

235.     On June 3, 2010, the State of Illinois, Securities Department issued a Temporary Order of Prohibition charging TAYLOR, CITY CAPITAL and Clean Sweep Holdings with failure to register securities and soliciting through an unregistered Dealer/Salesperson based

upon advertising by Defendants on the radio in Chicago from April 12-16, 2010 *that an investment with Defendants was "guaranteed to generate easy cash…up to $11,000.00 a month or more…" The Order further states that Defendants "represented to investors that for a onetime cost of only $4997.00, they would receive a return of their money of $11,000.00 per month.* (Ex. NN). The Illinois Order of Prohibition was the first step in the eventual demise of the Clean Sweeps program. TAYLOR and the CITY CAPITAL CONSPIRATORS had not calculated that anyone would actually complain about their tremendous investment offer.

236. On the exact same day the Illinois Order of Prohibition was issued, June 3, 2010, Defendants issued a press release announcing that 21 Clean Sweeps terminals had been placed in Rolesville, North Carolina. Incredibly, the press release declares that the Clean Sweeps program is "*100% legal.*" (Ex. OO).

237. In addition, the June 3, 2010 release states that: "On average, each gaming terminal is generating total unaudited gross monthly income of just over $400 per terminal. Considering that the retail price to the general public is $4997.00, mid and long-term ROI levels are considered exceptional. A consistent month-to-month increase in gross profit margins has been experienced during the last five months of 2010. Further, the total amount of unaudited revenue for the Rolesville installation generated by all machines during the inaugural month of January ($14,721) is only 62% of the amount generated between May 10 and May 25th ($23,582). In total, the unaudited gross revenue generated by the 21 machines since January (of 2010) was approximately $88,595.00." (Ex. OO). This Ponzi scam was now in full swing and the CITY CAPITAL CONSPIRATORS were pumping out inflated financial information to entice inexperienced investors to put their money in this incredible risk free investment opportunity.

48

238.    On June 10, 2010, Defendants issued a press release indicating that they had entered into a partnership with Bar Management Group to put Clean Sweeps machines in bars and nightclubs throughout the U.S. and that the first one would be placed in a bar in Jacksonville, Florida.  (Ex.PP).

239.    The June 10, 2010 announcement was odd considering that the CITY CAPITAL CONSPIRATORS had solicited thousands of church members as potential investors to invest in these machines.

240.    It goes without saying that the church members/investors would not have purchased these machines if they knew they were going into bars and nightclubs or were considered gambling and therefore illegal.

241.    On June 15, 2010, CITY CAPITAL filed a Form 10-K ("June 09 10K") with the SEC.  This annual report was for the Defendant's fiscal year ending December 31, 2009.  This annual report reflects that CITY CAPITAL disposed of ECC, which had been sold to CITY CAPITAL by TAYLOR, in November of 2007.  As a result CITY CAPITAL incurred a loss of $1,792,302. (Ex. QQ).

242.    In addition the June 09 10K indicates that CITY CAPITAL also sold its operating subsidiary Perfect Turf, Inc. and incurred a loss of $64,170.00. (Ex. QQ).

243.    The June 09 10K further states that City Laundry Services, LLC ("City Laundry") which was formed on January 22, 2009 purchased laundry cleaning businesses.  The June 09 10K indicates that CITY CAPITAL purchased 3 laundries between February and April of 2009 and sold 2 of the 3 in November of 2009. (Ex. QQ).  None of the laundries were operational by December of 2010 and in fact the last laundry was shut down due to CITY CAPITAL's failure to pay the rent.

244.     CITY CAPITAL also purchased City Juice Systems KS, LLC ("City Juice")

which later acquired L.A. Juice Company, Inc. and Blends 101, LLC.  Both the L.A. Juice

location and the Blends 101 location were closed by CITY CAPITAL after attempts to sell them

failed. City Beauty Systems,  LLC  ("City Beauty") purchases health and beauty businesses and

was still in existence at the time of the filing of the June 09 10K.(Ex. QQ).  However, although

CITY CAPITAL received investment monies in City Beauty, no investment properties were ever

purchased by City Beauty.

245.     According to CITY CAPITAL'S SEC filings, City Capital Petroleum, LLC

("City Petroleum") purchased gas stations. In fact, City Capital Petroleum purchased only one

gas station. It purchased a gas station and convenience store in Brookhaven, New York

according to the June 09 10K.  (Ex. QQ). This gas station closed in 2010 due to declining

revenues.

246.     Clean Sweeps Holdings Group, LLC, according to the June 09 10K, engages in

opening and purchasing businesses that operate technology centers.  At the time of the filing of

the June 09 10K, CITY CAPITAL had one start up Clean Sweeps location in Texas that opened

in October of 2009.  The other two Clean Sweeps locations that were purchased in North

Carolina were sold to a third party in the first quarter of 2010. (Ex. QQ).

247.     Nitty Gritty, LLC  was owned by City Capital and was a social network and

internet training site. CITY CAPITAL indicated it was for sale in the June 09 10K. (Ex. QQ).

248.     CITY CAPITAL owned 33% of The Millionaire Lifestyle Group which ceased

operations in December of 2009. (Ex. QQ).

249.     CITY CAPITAL also owned a 2.18% interest and managing member in NYC Liquidation Group, LLC.  These were Ebay drop-off locations which were closed in July of 2009 after being purchased for over a quarter of a million dollars in January of 2009. (Ex. QQ).

250.     CITY CAPITAL owned a 40% interest in The Male Room, LLC which was closed in December of 2009. (Ex. QQ).

251.     CITY CAPITAL owned a 20% interest in St. Clair Superior Apartment, Inc. which operates an apartment complex. (Ex. QQ). It is unknown whether this investment is still operational.

252.     As of December 31, 2009 CITY CAPITAL had a total of 28 employees: 15 administrative staff and 13 customer service employees. (Ex. QQ).

253.     CITY CAPITAL incurred net losses of $6,316,328 for the year ending December 31, 2009 and $2,602,457 for the year ended December 31, 2008. *(*Ex. QQ). Yet EPHREN TAYLOR received compensation of cash and stock of over one million dollars from CITY CAPITAL in each of those years.

254.     As of December 31, 2009 CITY CAPITAL had closed nine properties and generated $94,010 in revenues from the credit investor program. (Ex. QQ). This is a far cry from the "multi-million dollar" real estate deals that TAYLOR and Defendants were claiming had been consummated.

255.     The June 09 10K indicates that CITY CAPITAL'S accounting firm expressed doubt that CITY CAPITAL could continue as a going concern because of its **accumulated deficit of $18,468,522.** (Ex. QQ).

256.     According to the June 09 10K, City CAPITAL owned no real property. (Ex. QQ).

257.     The June 09 10K states under Recent Developments as  follows:

51

"The Company began marketing community development programs nationwide via touring by the current CEO, Ephren Taylor. The Company has developed a presentation featured at www.WealthTourLive.com that has toured the nation domestically as well as internationally. *Over 30,000 people have experienced this economic empowerment presentation. The presentation allows for positive Company exposure, as well as acquiring new partner clients. It also expanded the Internet marketing partnerships and Adword purchases, increasing lead flow. Interested leads may enroll directly on various partner sites like www. IRACashFlow.com or through the corporate website www.CityCapCorp.com. These activities are expected to significantly increase the existing credit-investor client base, which directly affects the potential volume of properties the Company can develop."*

(Ex. QQ). This is the most succinct description of the advertising schemes initiated by the CITY CAPITAL CONSPIRATORS to promote the self-directed IRA Ponzi schemes.

258.    Defendant TAYLOR received compensation of cash and stock of $1,051,000 in 2009 and $1,037,000 in 2008 respectively from CITY CAPITAL. Defendant WCONNOR received cash and stock of $250,000 in 2009. Defendant BRANTLEY received stock valued at $80,000 in 2008 and stock valued at $360,000 in 2009. Defendant MCCARTHY received stock valued at $360,000 in 2009. (Ex. QQ).

259.    As of June 10, 2010, TAYLOR owned 76.67%, BRANTLEY owned 5.27%, and MCCARTHY owned 4.17% respectively of CITY CAPITAL. (Ex. QQ).

260.    As of December 31, 2009, CITY CAPITAL had a working capital deficit of $7,186,142. (Ex. QQ).

261.    As of December 31, 2009, TAYLOR'S AmoroCorp owed CITY CAPITAL $1,635,174 as the balance on an outstanding promissory note for monies borrowed by AmoroCorp from CITY CAPITAL. The AmoroCorp note had an outstanding balance of $1,924,731 as of December 31, 2008. (Ex.QQ).

262.    As of July of 2010, CITY CAPITAL had ONE Clean Sweeps location open but had collected money from over 500 investors!

263.    On September 30, 2010 the CITY CAPITAL CONSPIRATORS issued a press release announcing the launch of their "major $5.7M financing initiative this fall." TAYLOR is quoted as saying in the press release: "*This is a game changer, and a major momentum shift of the growth of this company. This could easily add an additional $6M-$7M to the top line if we can execute the marketing over the next 12 months*."  (Ex. RR). However, it was never clear where this financing, if it existed at all, was coming from.

264.    Sometime in October of 2010, Defendants closed the Raleigh, North Carolina CITY CAPITAL office without warning.

265.    At the same time in September and October of 2010, most of the Clean Sweeps operations were shut down by Defendants or closed by local law enforcement as illegal gambling operations. However, the CITY CAPITAL CONSPIRATORS continued to take in and process investment funds without advising investors that they had discontinued their operations!

266.    Beginning in May of 2010, the CITY CAPITAL CONSPIRATORS started receiving an increasing number of customer complaints in their telemarketing call center in Raleigh, North Carolina.  Customers who had purchased Sweeps machines in late 2009 or early 2010 were complaining that they had not received any income from the machines as they had been promised, or that their machines had never been placed and activated or that the amount of return investment they received was substantially lower than what they had been told they would receive or that they were being overcharged by EQUITY TRUST.  The cracks in the Ponzi schemes were beginning to show.

267.    By August of 2010, the CITY CAPITAL telemarketing call center in Raleigh could not handle all of the complaint calls and the frustration of dealing with the non-stop angry

customer calls. This caused many CITY CAPITAL employees to walk out or simply not show up for work again.

268.     EQUITY TRUST was also receiving calls from worried and angry investors trying to find out what happened to their investments and where their money was- EQUITY TRUST, however, refused to assist the investors including Plaintiffs. The accounts of the Plaintiffs revealed little about their investments other than their initial purchase of the business, machine or real estate and that they held a promissory note.  EQUITY TRUST refused to provide any other information.

269.     It is estimated that less than 30% of the investment proceeds were ever invested in real estate, sweeps machines or anything else. The remaining proceeds were misappropriated and diverted by the CITY CAPITAL CONSPIRATORS to pay themselves, pay earlier investors or solicit new investors to perpetuate the Defendants' fraudulent schemes.

270.     The CITY CAPITAL CONSPIRATORS, in the summer of 2010, were running national radio ads advising potential customers of the Clean Sweeps investment program and its Certificate of Guarantee on investment returns.  It appears Defendants were desperate to increase cash flow and cranked up their marketing machine to bring in more "leads."

271.     In August of 2010, Defendants started offering financing to purchase Clean Sweeps machines for customers who did not have investment accounts or cash. This was one of the many signs that Defendants were in financial trouble and that the Sweeps Machine Investment Ponzi Scam was crumbling.  Defendants had previously refused to sell Sweeps machines to investors who wished to charge their purchase of the machines.  However, Defendants changed their mind and permitted investors to "charge" their purchase of a Sweeps machine.

272.     Sometime in October of 2010, the CITY CAPITAL office in Raleigh shut down without notice to its employees, customers or vendors.

273.     On November 2, 2010, CITY CAPITAL announced the resignation of Defendant TAYLOR as CEO and Chairman of the Board of CITY CAPITAL effective October 22, 2010 (Ex. SS).  Defendant WCONNOR also resigned as COO effective October 31, 2010.

274.     On November 23, 2010, TAYLOR held a conference call with investors of CITY CAPITAL.  TAYLOR told the investors that they would receive a full refund for their investments.  That refund never materialized.

275.     On December 21, 2010, a second Cease and Desist Order was issued by the State of Alabama Securities Commission against Defendants TAYLOR, CITY CAPITAL CORPORATION, Kinetra Dixon, City Petroleum, LLC and City Laundry Services, LLC. This Order states that in January of 2009 an Alabama resident attended a Wealth Summit Live seminar in Orlando, Florida.  Defendant TAYLOR was one of the speakers. (Ex. TT).

276.     The Alabama resident invested in Defendants and was issued two promissory notes, one for $50,000 and one for $25,000. The notes had an annual return on investment (ROI) of 20.00% (net after fees) and an annual cash return of $10,000.00 per unit**.** The Alabama Securities Commission concluded that the CITY CAPITAL CONSPIRATORS were operating as an unlicensed and unregistered securities dealer and therefore violated Alabama securities law. The CITY CAPITAL CONSPIRATORS were therefore ordered to cease and desist. (Ex. TT).

277.     As of 2009, Defendant CITY CAPITAL had an "F" rating with all Better Business Bureau offices that followed CITY CAPITAL.

278.     On January 20, 2011, the new CEO of Defendant CITY CAPITAL, who apparently has a gift for understatement, issued an open letter to the shareholders of CITY

55

CAPITAL. The letter stated that the new CITY CAPITAL management was revamping the company's strategy and operation. The letter further states that the new management had determined that "there were a number of inefficiencies within several subsidiaries" of CITY CAPITAL. (Ex. UU).

279.    On February 3, 2011, the I-Team Fox News ("I-Team") in Atlanta published a news article and aired a news story concerning a "scandal linked to Bishop Eddie Long and his church." The article states "Bishop Long says members of his congregation may have lost a million dollars to a businessman he brought into the church." The businessman Bishop Long was referring to is Defendant EPHREN TAYLOR. (Ex. VV).

280.    Long's church is the New Birth Missionary Baptist Church ("New Birth") in Georgia. The article states that TAYLOR made a presentation at New Birth about the Clean Sweeps sweepstakes video game machines and then the parishioners started investing in CITY CAPITAL. (Ex.VV).

281.    The article further states that the New Birth members learned after investing that CITY CAPITAL "had been indicted for operating a gambling enterprise*." One New Birth member indicated that he received a "Certificate of Guarantee" with his investment and contract documents. The Certificate of Guarantee stated that the sweepstakes machines would "generate revenues greater or equal to the amount of the investment."* (Ex. VV).

282.    However the I-Team investigation revealed that in September of 2010 police in Virginia had raided a number of sweepstakes store fronts and charged 11 owners or companies with illegal gambling. One of them was CITY CAPITAL through Clean Sweeps. Bishop Long posted a You Tube video appealing to TAYLOR to return his parishioners' investment money which Long indicated totaled about $1,000,000. (Ex. VV).

283. The Ponzi scheme executed by the CITY CAPITAL CONSPIRATORS and the EQUITY TRUST was finally revealed nationally. TAYLOR responded to Bishop Long's plea by stating that CITY CAPITAL was already working on settling with all of the New Birth members and returning their money. However, there is no evidence that any New Birth members received any of their investment monies back as TAYLOR had promised.

284. On February 27, 2011, Defendant EPHREN TAYLOR was named one of the Top 5 Richest African American CEOs. (Ex. WW).

285. In March of 2011, the North Carolina Attorney General announced an investigation of Clean Sweeps Holdings based upon consumer complaints from buyers of investments in Clean Sweeps via CITY CAPITAL. The article states that: "*Consumers say the company advertised on Christian radio and spoke to churches, promising that anyone who bought in would make their money back within a year or get a refund. But the NC Attorney General indicated that consumers complained that the Clean Sweep machines were never placed and that Clean Sweeps failed to provide refunds as promised.*" (Ex. XX).

286. In April of 2011, the plaintiffs in the case of <u>Anita Dorio et al v. EPHREN TAYLOR and CITY CAPITAL</u> ("Dorio Case") filed in Harris County , Texas, received a judgment of $1,226,000.00 against the defendants based upon allegations of fraud against TAYLOR and CITY CAPITAL in the investment solicitation of plaintiffs after meeting him at their church and also having a personal, private meeting with TAYLOR in Texas. Pl (Ex. YY and ZZ).

287. The Dorio complaint further alleges that TAYLOR had described his business successes to the plaintiffs from a teenager and indicated he could get a better return on investment for plaintiffs than anyone else. In addition, TAYLOR indicated that he would provide

superior returns and a "superior set of ethics." The Ponzi scheme that TAYLOR created was now becoming a public embarrassment and spectacle.

288. The Dorio complaint stated that TAYLOR told the plaintiffs that the investments were not risky because they were secured with tangible assets. Plaintiffs moved their entire life savings of over $1.4 million dollars to TAYLOR and CITY CAPITAL and then plaintiffs were unable to get any answers on what happened to their money. (Ex. YY). Plaintiffs never received their monies back.

313. Defendant EMERSON BRANTLEY'S Linked In profile states that he was a Director of CITY CAPITAL from October 2005 until December 2009. The description of CITY CAPITAL states as follows:

> City Capital (CTCC) is a publicly-owned socially- conscious investment management company. *Emerson Brantley developed the unique position statement of "Socially-Conscious Investing To Empower Urban Communities"; helped refine and target the prospect base to maximize profits; and was instrumental in redirecting the company's focus on quantum growth. He developed extensive public relations and media programs for City Capital beginning in early 2006, creating a groundswell of interest in the company, hundreds of media interview, and a national buzz around the company's founder, Ephren Taylor. Brantley's national campaigns to promote the company's private investor programs have brought thousands of qualified investors in the company's "community renaissance initiatives around the country. Targeting high net worth individuals (more than $1,000,000 investible assets), his campaigns converted up to 74.10% and raised $1.2 million for the company.*

(Ex. AAA) (emphasis supplied). The CITY CAPITAL CONSPIRATORS were all willing and able participants in these fraudulent schemes. BRANTLEY proudly broadcast his responsibility for creating what became the EPHREN TAYLOR persona that duped hundreds or thousands of investors.

314. BRANTLEY and MCCARTHY worked on various marketing initiatives with TAYLOR beginning in 2005 that helped develop TAYLOR'S public persona as a Christian multimillion dollar whiz kid with a knack for making wildly profitable investments.

58

### E. PLAINTIFF WILLIAM LEE INVESTS IN DEFENDANTS' PONZI

315.     In February of 2009, Plaintiff WILLIAM LEE invested $160,000 in City

Laundry.

316.     The " investment opportunity" was initially presented to LEE by Anthony Hall, a

contractor working for the CITY CAPITAL CONSPIRATORS.  Later, LEE and his wife met

with TAYLOR, WCONNOR and Hall where the City Laundry and City Petroleum

"opportunity" was presented.

317.     By creating a sense of urgency, TAYLOR caused otherwise conservative

inexperienced investors to quickly make investments because they didn't want to "lose out on the

opportunity."

318.     TAYLOR was particularly capable of "selling" investors who had sustained

serious and substantial stock market losses in the crashes of 2006-2008.  TAYLOR touted the

Defendants' investment schemes as a quick and easy way for the investors who had lost money

in the stock market crashes, like Plaintiff LEE, to recoup their investments through his

investment schemes which guaranteed not only the ROI performance of the investment but

claimed the ROI was two and three times that of any other type of investment.  As TAYLOR and

the other CITY CAPITAL CONSPIRATORS knew, practically no one who heard it and had

money or credit.

319.     LEE was told by Defendants that the assets of City Laundry were worth more

than twice the purchase price and that City Laundry would be "debt free."  In fact, most of the

equipment was leased in the City Laundry location LEE was investing in, but this was not

disclosed to LEE by the CITY CAPITAL CONSPIRATORS at the time he made the investment.

320.     LEE, like other Class members, received a one year promissory note from City Laundry as the "Maker" signed by TAYLOR. The promissory note contained a 20% annual interest rate for one year. It was verbally agreed that once the transition from promissory note to an equity position was made, that the profits in excess of 20% were to be split evenly between LEE and CITY CAPITAL.

321.     LEE had been told that the ultimate goal was for Defendants to give LEE an equity position in City Laundry. At the time of the investment, Defendants had indicated that City Laundry was a growing business with no debt. Again, this representation was false, but LEE was not aware of that because, despite his repeated requests, he was not permitted to review the books and financial records of City Laundry either before or after his investment.

322.     In fact, in an email dated May 12, 2009, WCONNOR indicated that in three months the CITY CAPITAL CONSPIRATORS would review LEE'S note vs. equity position, i.e., no later than August 15, 2009 and make a determination as to what was the best decision for all parties.  (Ex. HHH).

323.     In addition, WCONNOR stated:  "From our dinner meeting I sense that you and Mrs. Lee surround yourselves with like-minded individuals *and because I'm fairly positive that your circle of influence contains only those looking to live out their socially conscious purpose and who are good stewards, I will leave this out of the first requirement. However, just know this is our biggest requirement and it out weights how much money a prospective client may have to put towards making a difference in this world while growing their nestegg.*" (Ex.HHH). WCONNOR again reinforced the Defendants' Ponzi scheme to LEE by "preaching" exclusivity to those who were "socially conscious."

324. In April of 2009, LEE was asked to sign as a personal guarantor on the equipment lease for City Laundry. LEE did not know that the City Laundry equipment was subject to such an equipment lease until after he had made the investment in City Laundry. The CITY CAPITAL CONSPIRATORS told LEE that unless this equipment was leased for City Laundry, they could not move forward with the business and it would fold. LEE did not want to lose the money he had already invested in City Laundry, so he agreed to personally guarantee the equipment lease.

325. LEE again requested financial information and the books and records of City Laundry in order to determine if he wanted to become an equity member of City Laundry. But LEE never received any information.

326. The reason now is clear. The June 09 10K (Ex. QQ) indicates that as of December 31, 2009, CITY CAPITAL had $7,908,191 in outstanding notes payable. CITY CAPITAL was operating at a working capital deficit of $7,186,142 and had cash on hand as of December 31, 2009 of only $182,226!

327. In November of 2009, CITY CAPITAL sold the City Laundry Blue Ridge Cleaners for $10,002 (which was the balance of a promissory note due to be paid by CITY CAPITAL including interest) that it had purchased for $148,500 in March of 2009.

328. In November of 2009, CITY CAPITAL sold the City Laundry 39th Street Laundromat for $20,000 that it had purchased for $97,625 in February of 2009.

329. On February 1, 2010, LEE, like other Class members, requested his money back before the promissory notes became due on February 10, 2010. However, no one would assist him in obtaining return of his investment monies. (Ex.III)

61

330.    LEE'S EQUITY TRUST account revealed little about his investment other than the initial purchase of the business and that the investment was secured by a promissory note. It appears that EQUITY TRUST was charging fees multiple times and deducting them from LEE'S and the other Class members' accounts.  CITY CAPITAL was also supposed to be paying the fees so it is unknown why EQUITY TRUST would be deducting anything from Plaintiffs' accounts. (Ex. JJJJ).  This is just another example of the sloppy, inaccurate recordkeeping of EQUITY TRUST.

331.    LEE decided to exit the investment because of the lack of information, reports or financial data received from Defendants despite repeated requests. Upon demand for repayment, LEE was told that "it might take a while to generate the cash."  As of the filing of this Complaint, LEE has not received return of his monies. The EQUITY TRUST were aware that investors were requesting return of investment monies for promissory notes that had become due yet no one received return of their investment funds.

332.    However, WCONNOR responded to LEE's February 1, 2010 request for tender of the funds and advised that CITY CAPITAL had "slated" LEE for an equity position and therefore Defendants would have to replace LEE with another investor, transfer the lease and equipment to a new lessee and then liquidate the note position. WCONNOR estimated that would take 45-60 days and then LEE's funds would be sent to EQUITY TRUST.  (Ex.JJJ)  So WCONNOR confirmed that the CITY CAPITAL CONSPIRATORS were conducting a Ponzi scheme because new investors had to contribute in order for the older investors to obtain return of their investment funds.

333. In March of 2010, LEE requested that TAYLOR schedule a conference call with him to discuss resolution of the re-payment of the City Laundry promissory notes by Defendants to LEE. (Ex. KKK).

334. LEE continued to request that CITY CAPITAL provide him with information on the financials and books and records of City Laundry and City Petroleum. Finally after several months, LEE was asked to attend a meeting in May of 2010 with WCONNOR to discuss the situation.

335. However, when LEE got to the meeting, WCONNOR indicated that LEE could not review the books and records for City Laundry or City Petroleum unless LEE executed a confidentiality, non-disclosure and indemnification agreement. LEE refused to sign the documents. (Ex. LLL).

336. WCONNOR also presented a "settlement agreement" at the meeting which included a payout to LEE over 2 and one half years by selling CITY CAPITAL stock each quarter to raise the cash.

337. WCONNOR presented LEE with 3 choices: 1. Have CITY CAPITAL execute a new promissory note; 2. Sign the settlement agreement referred to above; or 3. Become equity members of the businesses.

338. WCONNOR advised LEE that CITY LAUNDRY had "tanked" but that "City Petroleum" was doing fairly well. However, after this meeting City Petroleum also went out of business.

339. WCONNOR also told LEE that CITY CAPITAL did not have the funds to pay back the monies due LEE on the promissory notes because TAYLOR had loaned "a bunch of

money to some churches and these churches defaulted on their loans." Plaintiffs believe TAYLOR took most of the money for his own personal use.

340.    On June 15, 2010, Kinta Dixon emailed LEE and told him that he would be "looking into removing LEE from the equipment lease as a guarantor." (Ex. PPP).

341.    On June 21, 2010, Kinta Dixon advised LEE that he was waiting for the documentation to make the transition of the equipment lease guaranty. (Ex.QQQ).

342.    On September 13, 2010 LEE again requested from CITY CAPITAL representatives the status of repayment of his notes and removal of his name from the City Laundry equipment lease guarantee.

343.    On September 29, 2010, LEE again requested information on the status of payment of the promissory note and removal of his name from the City Laundry equipment lease guarantee. The City Capital representative indicated he would have to speak to TAYLOR not WCONNOR. (Ex.RRR).

344.    In November of 2010, LEE learned that CITY CAPITAL was trying to sell City Laundry for $15,000 but had been unable to find a buyer because the buyer had to qualify to take over the lease payments on the City Laundry dry cleaning equipment.  CITY CAPITAL had not paid the rent, and there was a large amount outstanding (in excess of $100,000 because CITY CAPITAL had not paid the rent, which had accelerated the lease).

345.    On December 17, 2010, LEE was copied on an email to TAYLOR from the City Laundry equipment leasing company advising TAYLOR that the rent on City Laundry was past due and that even though a new lessee had been located who would be willing to lease the space and take over the equipment lease, nothing could be done about it until the rent payments were brought current. (Ex.SSS).

346.     On December 30, 2010, LEE was copied on an email from TAYLOR to the City Laundry equipment leasing representative indicating that CITY CAPITAL'S new CEO was shutting down City Laundry because Defendants could not come to terms with the landlord on the overdue rent. TAYLOR indicated that a trust had been set up by City Capital to resolve all debts.  But to LEE'S knowledge, no debts have been satisfied. (Ex. EEEE).

347.     In January of 2011, LEE advised TAYLOR that he was trying to work out a financial settlement with the equipment leasing company for City Laundry in which LEE had signed a personal guarantee.  LEE was trying to avoid being sued for the equipment lease which he had personally guaranteed. TAYLOR and Kinta Dixon had also signed personal guarantees for the laundry equipment.  However, CITY CAPITAL was also behind on the City Laundry rent payments so the rent payments also had to be brought current in order to resolve the issues with the equipment lease. (Ex. FFFF).

348.     In order for LEE to discuss settlement of the City Laundry note and equipment lease debt, he was required to execute a "Claim Form and Tolling Agreement." (Ex. GGGG) This agreement provided that the statute of limitations for filing suit was tolled while the parties discussed settlement, that all discussions were confidential and that Lee was to disclose to CITY CAPITAL any misuse or misappropriation of confidential information. LEE had to give 30 days notice in order to terminate the Tolling Agreement. Clearly the tolling agreement was being used to keep all of the victims of the CITY CAPITAL CONSPIRATORS' Ponzi schemes quiet. One of the patterns of conduct the CITY CAPITAL CONSPIRATORS undertook was to have all victims sign confidentiality agreement whenever possible to keep the CITY CAPITAL CONSPIRATORS' fraudulent conduct a secret.

349.     In January of 2011, LEE received a letter from an attorney in Kansas City, Missouri representing the leasing company for the laundry equipment that was in City Laundry. The letter demanded that LEE pay $100,232.46 to satisfy the City Laundry existing debt, late fees and interest. (Ex. HHHH). LEE again contacted the CITY CAPITAL CONSPIRATORS in an effort to settle the matter to no avail.

350.     In March of 2011, LEE was named as a defendant along with City Laundry, TAYLOR, and Kinta Dixon in a law suit in Jackson County, Missouri seeking damages for breach of the equipment leases by City Laundry and breach of the personal guarantees of TAYLOR, LEE and Dixon. LEE and the other defendants had a judgment entered against them for $133,457.33. LEE is still attempting to get the CITY CAPITAL CONSPIRATORS to assist him in satisfying the judgment. (Ex.  IIII).

351.     LEE and the other Class members were told repeatedly that CITY CAPITAL had set up a trust fund to reimburse victims of the CITY CAPITAL Ponzi schemes and that Defendants would return LEE'S investment funds.   Sadly, those representations were also false and LEE has been forced to file this action to try to recoup his lost investment monies.

**G.  PLAINTIFF GENNET THOMPSON INVESTS IN DEFENDANTS' PONZI SCEME**

352.     Sometime prior to July of 2009, THOMPSON saw an advertisement on the Black Entertainment Network ("BET") advertising investment opportunities with Defendants. Defendant TAYLOR was the spokesperson and was talking about investing in real estate through a self-directed IRA with a guaranteed rate of return.  The self-directed IRA was renewable for one or two years.

353.     THOMPSON called the toll free number on the television ad and requested information on the investments Defendants offered. When THOMPSON called to inquire about

investing, she was told by Defendants' representative that the ROI on her investment through the self-directed IRA was guaranteed to double. Defendants requested THOMPSON's email address so they could send her further information.

354.     Defendants also advised THOMPSON that their self-directed IRA products provided an opportunity for "socially conscious" investing such that the monies invested through the self-directed IRA were used to fund affordable homes, local businesses and revitalization projects for working class families.

355.     On July 1, 2009, THOMPSON received an email from the CITY CAPITAL CONSPIRATORS via Defendant TAYLOR. This email outlined the CITY CAPITAL CONSPIRATORS' investment program.  The email advised that THOMPSON could **double her return on investment** by investing with the Defendants through "City Capital's socially-conscious programs."  (Ex. BBB).

356.     The July 1, 2009 email from Defendants encouraged THOMPSON to complete a "Client-Investor Pre-Application form ("Client Application") and fax it to Defendants for a "FREE Portfolio Review (value of $495)". The email indicated that the value of the Defendants' "free" review of THOMPSON's Portfolio was $495.  Although later Defendants stated it was worth $595 (Ex. BBB).

357.     After THOMPSON faxed the completed Client Application then THOMPSON was advised to call the Defendants' toll free number and set up an appointment to get her questions answered about Defendants' programs by an investment counselor.  (Ex.BBB).

358.     The CITY CAPITAL CONSPIRATORS' July 1, 2009 email references a document THOMPSON downloaded from Defendants titled "3 Simple Steps to Multiply Your Retirement Income Using Federally Approved Programs"  ("3 Simple Steps"). This document

67

was created by the CITY CAPITAL CONSPIRATORS in 2008 (Ex. CCC). 3 Simple Steps was

written by WEB3, MCCARTHY and BRANTLEY with the assistance of TAYLOR AND CITY

CAPITAL. (Ex. BBBB). Indeed the WEB3 website lists TAYLOR and TAYLOR'S

AmoroCorp as clients of WEB3. (Ex. AAAA).

359.     3 Simple Steps is 64 pages long. The length is probably intentional. It is too long

for most investors to have time to read and long enough that Defendants can point to it and

declare that they had adequately disclosed the risk of their investment schemes. The Introduction

begins with "How would you feel if you were to discover an investment strategy that earned *at*

*least (emphasis in original)* twice what you current investments get now…" (Ex. CCC).

360.     3 Simple Steps further states: "On the other hand, if 100% of your investment

money-including 100% of your annual profits could be plowed back into your ongoing

investments without taxation, can you imagine how much faster your nest egg would grow?"

(Ex. CCC).

361.     3 Simple Steps lists the options in which THOMPSON could choose to

invest the proceeds of her self-directed IRA:

    a.     Money Market, CDs, Saving Accounts (but Defendants advise that

these are "probably not the top choices").

    b.     Stock, bonds, mutual funds (but Defendants advise that they are

"too much work").

    c.     Collectibles (but Defendants advise that there is a "much smaller,

niche market of potential buyers if you need to go liquid quickly" ).

    d.     Real Estate Properties (Defendants state this is the most common

investment for self- directed IRAs but this investment option "is only practical if

you have a professional management group doing all the work, so you don't have to").

e.     Notes or Mortgages-Defendants advise this is a good use of investment funds because "you control it with the note or mortgage and earn whatever rate you establish" however Defendants caution that "there is essentially no way to increase the return through the life of the loan."

f.     Cash-Flowing Businesses-Defendants recommend this option as a way to "collect all profits from a thriving business tax-free (or tax-deferred)!"

g.     Producing Oil or Gas Properties-Defendants recommended this investment option to THOMPSON and state "Who doesn't dream of owning their own oil well?"

h.     Alternative Fuels and "Green Technologies"-Defendants also recommended this option so that THOMPSON could invest "in the growing demand for cleaner, "greener" energy sources." (Ex. CCC).

362.    Defendants' advised THOMPSON in 3 Simple Steps that a self-directed IRA is like "becoming your own bank" and that banks and brokerage houses don't recommend self-direction because banks want to keep investors money" in their vault." (Ex. CCC).

363.    3 Simple Steps outlines the 4 "myths" that Defendants indicate keeps investors like THOMPSON from using self-directing IRAs and multiplying their return on investment:  "1. Perceived Hassles 2. Uncertainty 3. Lack of Security and 4. Higher risk."   (Ex. CCC).

364.    Defendants then refuted these investment "myths" by stating:

i.      *Perceived Hassles*-"**Your self-directed account can be almost as hands-off as your institutionally –controlled IRA with profits happening automatically… you just earn more.** (emphasis in original)." (Ex.CC).

ii.     *Uncertainty*-As to real estate investments: "as most real estate markets continue to struggle, there is a 15-year backlog of demand of homes in this market segment" (working class family homes); as to buying a business- Defendants gave an example of a pizzeria purchased in one client's IRA with a return on investment (ROI) of 61% as compared to a "passive investment" which would yield an ROI of 7.5%.

iii.    *Lack of Security*-Defendants indicate that if  THOMPSON placed her money in a bank or brokerage " her money would not be as secure as banks and brokerages claim and that "although your IRA may be covered up to $100,000, the account will probably do no more than break even against inflation, if not lose money every year.  That's the price of security."

365.    Defendants also copy and paste an email disclaimer about investments from Bank of America about FDIC insurance and use that as an example of the fact that there is no safety in putting your money in a brokerage or bank. Defendants distinguish themselves from banks and brokerages by stating that the difference is-"City Capital doesn't pretend to be some massive marble-facade investment house dealing in trillions of dollars.  Not in our marketing, not in our images, not anywhere.  We are a public company (CTCC) and we go where most Big Banks and investment houses rarely go: into communities and cities to find socially-conscious programs."

70

Defendants state definitively: "**In Our Program, with Equity Trust as Custodian, Your Money IS Insured.** (emphasis in original). (Ex.CCC).

366.    But the most chilling discussion occurs next:

"Most important, as the Bank of America email disclaimer clearly tells you, the federal government does NOT cover your money placed in stocks, bonds, mutual funds, life insurance, annuities, even if they were purchased from an FDIC-insured bank.  FDIC also doesn't insure investment items backed by the U.S. government such as U.S. Treasury bills, bond or notes, or items kept in a safekeeping box, or uninsured bank deposits. So for most of your investments, you carry risk.  Evaluating that risk, and the investment security behind it, is extremely important. ***It doesn't matter if the company has hundreds of offices and hundreds of thousands of employees scattered all over the world..the moral and ethical compass of that company will determine how dedicated they are to you and your account and your security***".

(emphasis supplied). (Ex. CCC).

367.    Defendants then indicate that the money THOMPSON invests through CITY CAPITAL is insured by the FDIC. However, the document states that FDIC insurance only applies to" uninvested cash" and" self-directed IRA deposits".  Defendants emphasize that there is $250,000 of FDIC insurance for the self-directed IRA deposits.

368.    But Defendants deliberately fail to disclose that there would no FDIC insurance for THOMPSON's investments in businesses, real estate, oil and gas, charities, etc. through a self-directed IRA which they have encouraged and recommended THOMPSON to do- because there would be no cash to insure.

369.    *The document continues:*

*Higher Risk*-The insidious nature of the fraud perpetuated by Defendants is most clearly illustrated in this explanation.  First, the Defendants' disclaimer: "However, it's all relative. We don't recommend that anybody invest solely on the basis of a phone call, webinar, radio ad or brochure… or whatever their financial advisor, brother-in-law, parent, pastor, or even City Capital representative tell them!  The important thing is, perform your own due diligence and learn everything about any investment program and the ethics and vision of the company behind it."…. "We prefer creating significant returns, and doing it

71

steadily month after month, quarter after quarter, whether the "economy" is up, down or sidewise. We will use your money to help one, ten, twenty a hundred or more families live the American Dream and enjoy new economic opportunities…and gladly pay you for the privilege of partnering with you to make it a reality."

Defendants also encourage THOMPSON to "Google" Defendant EPHREN TAYLOR and read about his many accomplishments. (Ex. CCC).

370.    Interestingly, Defendants further state that: "Your self-directed custodian or trustee has no hidden agenda for your money.  They will answer your questions, but they do not give investment advice…"  (Ex. CCC). It was not disclosed to Plaintiffs or other Class members that employees selling the self-directed IRA or Clean Sweeps machines were improperly paid on a commission basis only.

371.    And now a succinct statement of Defendants' pitch:

**"For this type of investor, the ideal company is one that has a social conscience, is making an important contribution to the betterment of mankind,** *and* **will give you (sic) provides great returns on your investment. And wouldn't it be terrific if such a company delivered** *twice as much* **as what you have been getting?  Surprisingly there is such a company."**

(Emphasis in original). (Ex. CCC).

372.    **Defendants further state: "City Capital makes it possible for individuals to invest in socially-conscious programs, using proven structured programs within their IRA… With a better return on investment than the investor has ever received."** (Emphasis in original) (Ex. CCC).

373.    Then Defendants state "**City Capital's programs help to empower communities financially through job creation, alternative energy projects, and other community renaissance initiatives that benefit us all."** (Emphasis in Original) (Ex. CCC).

374.     Defendants then discussed the "Goshen Division" of CITY CAPITAL. The Goshen Division (a/k/a Goshen Energy and a/k/a Goshen Energy Division) is described by Defendants as focusing "primarily on developing biodiesel and other alternative fuels created from plant matter and waste oil. This division partners primarily with small colleges and has been involved in natural gas and oil reclamation projects with select clients, where marginal wells are revitalized, creating on- going cash-flow." (Ex.CCC). But by this time the CITY CAPITAL CONSPIRATORS knew that Goshen had already lost the rights to the one oil and gas lease that they had attempted to purchase because of lack of funds.

375.     The Goshen Division was also mentioned in a press release by Defendants dated June 9, 2009 indicating that CITY CAPITAL, through its wholly owned subsidiary City Capital Petroleum, LLC, had acquired a "retail petroleum distribution center with a convenience store attached" in New York with supposedly "un-audited revenues of $3million in 2008." (Ex. DDD). In other words, Defendants purchased a gas station with a convenience store.

376.     TAYLOR is quoted in the June 9, 2009 press release as stating "With our Goshen Energy division producing bio-fuels, we anticipate using our physical stations to distribute the fuel. This will create a vertically integrated company from production to retails."  (Ex. CCC). But this sophisticated statement means nothing more than Defendants have one gas station in New York that might sell their fuel if they ever have any.

377.     Finally, Defendants encouraged THOMPSON to invest through her self- directed IRA in oil wells. Defendants indicate that they have developed a more cost effective method of extracting oil even from marginal wells.  Defendants brag: "For our investor, the returns are significant." (Ex. CCC). However there is no evidence of significant returns for any investor in oil wells through CITY CAPITAL or any other investment option offered by Defendants. In fact,

73

there is no evidence that CITY CAPITAL ever purchased an oil well since it defaulted on the only oil and gas lease deal that it disclosed.

378.    Defendants assured THOMPSON that everything about the transaction was "all arms-length yet you retain complete control'; if you have a self- directed account, you can begin doubling your interest immediately"; once your rollover funds are released to the new custodial trustee, "you begin receiving *at least* twice your current rate of return the day you assign your funds to the City Capital program."  (Ex. CCC).

379.    Defendants also indicate: "**You do <u>nothing</u>. We do everything.  And *you* get the profits.**" (emphasis in original).  Defendants state that they" acquire the investments, oversee renovations and upgrades, handle manage, and secure tax abatement, block grants and federal monies" for investments (Ex. CCC).

380.    Defendants encouraged THOMPSON not to "get caught in the ***paralysis of analysis"*** and to act quickly to send in her Personal Portfolio Review for analysis. (Ex. CCC).

381.    Then the brochure lays out TAYLOR'S bio including his numerous awards, appearances on television, speaking engagements, Urban Wealth Tour, and his books. THOMPSON was also offered a complimentary signed copy of TAYLOR'S latest book when she submitted her Personal Portfolio Review application to Defendants for which Defendants indicate that "Big Broker financial advisors charge up to $595." (Ex. CCC).

382.    THOMPSON also received another document, dated 2008, from Defendants entitled "Eliminate the Roadblocks to Profitable & Secure Real Estate Investing (Eliminate the Roadblocks)." This document is 29 pages long and again describes Defendants' real estate investing programs. (Ex. EEE).

383.     Defendants in Eliminate the Roadblocks describe CITY CAPITAL's investment program as using real estate investing to create socially-conscious investing opportunities, to empower communities. To change lives. To create affordable homes for working-class families. And to do it as part of a for-profit corporation…what a novel concept!" (Ex. EEE).

384.     Defendants also introduced the concept of "Community Renaissance Initiatives" in Eliminate the Roadblocks.  This program according to Defendants is a program where Defendants work with a dozen to a hundred homes in an area and "create their own market" for the homes. (Ex. EEE). This concept while sounding legitimate actually does not make sense since it  appears Defendants are suggesting that by offering to buy all of the homes in an area they are creating a market for those homes.

385.     Defendants further advised THOMPSON in Eliminate the Roadblocks that with their "Credit-Investor" program (to qualify, an investor must have a minimum of a 700 credit score; $70,000 in household income and $25,000 in capital assets) THOMPSON can be matched to an income-producing property in the Community Renaissance program and she does not need to do anything-Defendants take care of everything and THOMPSON keeps the net profits from all of the property rents and resales. (Ex. EEE).

386.     The CITY CAPITAL program outlined in Eliminate the Roadblocks also includes the CITY CAPITAL "One Year Limited Mortgage Payment Guarantee" which provides for "unseen vacancies" in the investment property and guarantees that the property will be rented for the first year or CITY CAPITAL will pay the mortgage.  (Ex.EEE).

387. Defendants provide the following assurance to Plaintiff:

"We aren't promising some pie-in-the-sky real estate bonanza, but we can promise to make sure your properties all have cash-flow from the day you close, and we'll even cover potential vacancies by paying your mortgage payment for up to a year." (Ex. EEE).

388. Defendants, in the Eliminate the Roadblocks brochure, also answer a question Plaintiffs and other Class members would like to know the answer to: How does City Capital make money? The answer from CITY CAPITAL: "Easy. We make our money through those negotiations and agreements with local community, municipal, private and non-profit partners to take on these large-scale programs. …"Through these agreements we lower or eliminate the acquisition and other upfront costs that most investors would have to bear. This allows us to use our available cash reserves-and those of our cash and rollover clients-for other steps of the process, such as renovation or marketing of the properties. Then we leverage the strength of our Credit-Investors-some of whom have been with us for years-to take over the completely renovated homes so we can repeat the process again and again in other communities nationwide." (Ex. EEE). The sad truth: CITY CAPITAL never made money- it just took its clients' monies fraudulently. There were never any real CITY CAPITAL investment success stories.

389. The truth: Defendants had no experience in managing or operating this kind of real estate investment fund and with few exceptions, never got any of these programs off the ground. But they continued to take in investor's money including Plaintiffs.

390. On July 5, 2009 THOMPSON received the following email from Defendants via EPHREN TAYLOR:

'Hi Gennet THOMPSON,

Recently you visited our website www.IRACashFlow.com and downloaded the special report "3 Simple Steps To Double Your Retirement Income Tax Free Using Federally-Approved Programs." That's quite a long title, isn't it? But it still doesn't include one of the most important and unique aspects of our programs: what we call "socially conscious investing."

From the very start, CEO Ephren W. Taylor II has insisted that City Capital Corp. focus on programs that do more than return a profit to investors. As a result, we have provided affordable homes for working class families; we have developed processing plants for alternative fuels from renewable resources; we're investing in businesses that are the lifeblood of a neighborhood and we're reviving abandoned wells to reduce America's dependence on foreign oil.

Some of our programs look like things a non-profit agency would do but when we do them, our investors get up to double their old returns on their investments. Our investors appreciate (and we hope you will too) is that their money is being used in positive, useful and beneficial programs. It's as if United Way paid you interest on your donations!
If you like the idea of socially-conscious investing AND double returns on your investment capital, take a few minutes to call and arrange an appointment with one of our investment counselors. Even the call is fr.ee -- 877-367-1463.
We look forward to hearing from you soon.

Sincerely,
The City Capital IRA Team"

(Ex. FFF).

391.    Then on July 7, 2009, THOMPSON received another email from Defendants via EPHREN TAYLOR. This email contained the subject line: "Gennet THOMPSON, About Ready to Hide Your Money Under a Mattress?" (Ex.GGG).

392.    The Defendants again advised THOMPSON in the July 7, 2009 email that "City Capital can make your IRA nest egg grow as much as double your previous earnings in programs that promote community renaissance initiatives and economic empowerment." This email also encouraged THOMPSON to "get the answers you need to start doubling your retirement today." (Ex. GGG).

393. Based upon the representations, promises, assurances and guarantees provide by Defendants via phone, email, radio ad, television ads, advertising materials and brochures, THOMPSON in July of 2009 contacted Defendants and advised them she was ready to make an investment in Defendants' Self-Directed IRA Real Estate program. THOMPSON was instructed to use EQUITY TRUST for her self –directed IRA by Defendants. THOMPSON invested $16,000 through a self-directed IRA with EQUITY TRUST and received a promissory note signed by TAYLOR.

394. On February 19, 2010, THOMPSON received an email from Defendants via EPHREN TAYLOR. This email, with the subject line, "Congratulations, you're in the door…" solicited to THOMPSON the promise of a "once in a lifetime opportunity." (Ex. MMM).

395. It should be noted that the address TAYLOR uses in New York is a "virtual office" meaning that City Capital did not have an actual physical office on Wall Street but simply paid a monthly fee to use that address.

396. THOMPSON then emailed Ebony Rowland, a representative of Defendants at CITY CAPITAL, to get the necessary documents to make an investment in Defendants' "Sweep Income Investment." Rowland emailed back "*EPHREN just announced this opp (opportunity) on CNN and took it public." Ms Rowland indicated that as a result CITY NATIONAL was "swamped"* with calls by investors trying to get in on this "opportunity." *(Ex.* NNN).

397. THOMPSON ordered 3 machines from Defendants and paid $10,500 via wire transfer for all three machines. The Sweeps Terms and Conditions stated that THOMPSON received a "100% Satisfaction Guarantee" from Defendants. This 100% Satisfaction Guarantee stated that if THOMPSON did not recoup her investments from the return on investment of the

machines within 3 months of the Sweeps machine placement then THOMPSON's investment monies would be returned to her. (Ex. OOO).

398. On August 30, 2010, THOMPSON received a letter from Clean Sweep Holdings that as of September 1, 2010 all three of THOMPSON's terminals were placed at a location on Newtown Road in Virginia Beach, Virginia. (Ex. TTT). There was no explanation as to why the terminals were not placed in Garner, North Carolina. (Ex. SSS).

399. Thereafter THOMPSON received a letter from the CITY CAPITAL CONSPIRATORS dated September 23, 2010 indicating that authorities in Virginia Beach, Virginia had shut down the Newtown Road location where THOMPSON's Sweep Machines were placed. (Composite Ex. TTT). Virginia law enforcement had raided the Virginia Beach location and shut it down as an illegal gambling operation.

400. The CITY CAPITAL CONSPIRATORS also enclosed a copy of an opinion from the Attorney General for the State of Virginia dated July 30, 2010. The opinion indicated that sweepstakes machines were legal as long as "the element of consideration is missing when no purchase is required to enter the drawing…or game." However, the Sweeps Machines CITY CAPITAL CONSPIRATORS sold required purchases by the contestants, therefore, falling outside of the protection of the Virginia Attorney General Opinion. (Composite Ex. TTT).

401. Then on October 20, 2010, THOMPSON received a letter from Defendants advising her that the Virginia Beach location had been shut down since mid-September and was not producing income so CITY CAPITAL sent her a check for her losses of $262.17. Defendants indicated they would continue to send THOMPSON checks for her financial loss until the Virginia Beach location was back on line. Defendants stated that they anticipated the Virginia Beach location being back on line within 30 days of October 20, 2010. (Ex. UUU).

79

THOMPSON never received another check and the Virginia Beach location never reopened. THOMPSON also never received return of her investment funds despite repeatedly requesting same.

402.     On December 11, 2010, THOMPSON sent an email to an employee of CITY CAPITAL who had served as her "investment counselor". The email indicated that she had received a call from a "Scott" who wanted to know if THOMPSON wanted to continue the Sweeps program with another company that he worked for. In addition, THOMPSON requested a copy of her 100% Satisfaction Guarantee Certificate and a copy of her renewed note. THOMPSON also requested information on how to obtain a refund (Ex. VVV).  Thompson received a responsive email indicating her refund was in process (Ex. WWW).

403.     Thompson  has filed suit this action after failing to obtain return of her investment monies and despite many promises by Defendants that Thompson's monies would be returned and receipt by Thompson of  fraudulent settlement proposals and empty promises. (Composite Ex.XXX).

### H.   PLAINTIFF TRUDY MORGAN INVESTS IN DEFENDANTS' SWEEPS MACHINE INVESTMENT PONZI SCHEME

404.     MORGAN met TAYLOR in 2009 at her church in Lithonia, Georgia when TAYLOR was invited to speak to the congregation about successful investing and the investment programs that were recommended by TAYLOR.

405.     When TAYLOR spoke at MORGAN'S church, he was accompanied by Robert Batt, a retirement account specialist for EQUITY TRUST, 225Burns Road, Elyria, Ohio 44035.

406.     TAYLOR introduced Batt to MORGAN'S congregation as TAYLOR'S" personal banker." However, Batt was not a banker, Batt was  an agent of Defendant EQUITY TRUST who also worked for CITY CAPITAL. The CITY CAPITAL CONSPIRATORS steered

80

investors like MORGAN and the other Class members right to EQUITY TRUST who at the time of MORGAN'S investment was the exclusive custodian/ agent for any retirement plan invests including, self-directed IRA investments, to CITY CAPITAL.

407. In fact, Batt was an agent/employee of EQUITY TRUST whom Defendants utilized exclusively at that time as a self-directed IRA custodian for investors of CITY CAPITAL and its subsidiaries. TAYLOR and the other CITY CAPITAL CONSPIRATORS required that CITY CAPITAL investors use the EQUITY TRUST for their self-directed IRAs.

408. The "partnership" or enterprise between the CITY CAPITAL CONSPIRATORS and the EQUITY TRUST is best demonstrated by the document given to potential victims/investors by the CITY CAPITAL CONSPIRATORS titled "Ephren's **TOP** Resources!" (Emphasis in Original). This document lists Robert Batt at Equity Trust as the contact for Self-Directed IRA's for CITY CAPITAL . (Ex.CCCCC).

409. At the meeting at MORGAN'S church, TAYLOR discussed his long standing success as a businessman, teenage millionaire story and his investment advice to the participants like MORGAN who were trying to find more successful investment strategies and a greater ROI.

410. After hearing TAYLOR speak, MORGAN decided to transfer her $20,000 IRA account to EQUITY TRUST per the CITY CAPITAL CONSPIRATORS' instructions. Batt was MORGAN'S sole contact at EQUITY TRUST and handled all communications between the Plaintiffs and EQUITY TRUST.

411. TAYLOR was a master at using verbal constructions to describe the investment "opportunities" he was hawking so that they sounded extremely impressive but actually were meaningless. TAYLOR used his confidence trick to take advantage of his targets' lack of

81

investment knowledge or competence. TAYLOR served as a "hub" for the victims recruiting and interacting with them directly in order to perpetuate the scheme.

412.    The Ponzi schemes orchestrated by the CITY CAPITAL CONSPIRATORS  were particularly well planned because the "investments" of the Plaintiffs and other Class members in the Clean Sweeps machines were set up to automatically renew or "rollover" each year such that the investors could not liquidate their investments automatically at the end of the investment period and, in fact, were not even notified at the end of any investment period that they could withdraw their investment funds or" choose" to reinvest; the interest or profit that purportedly was being earned on the investment "appeared" in the investors/victims' self-directed IRA accounts at EQUITY TRUST or on their Clean Sweeps investment account statements automatically and regardless of whether the accrued interest/profit had actually been placed in the account.  (It had not for the majority of investors/victims).

413.    So the CITY CAPITAL CONSPIRATORS kept sending out investment account statements and providing information to investors/victims showing the CITY CAPITAL investors/victims the extraordinary investment returns they were earning on their Clean Sweeps machines by keeping their money in their EQUITY TRUST self-directed IRA account or their CITY CAPITAL Clean Sweeps investment account thus maintaining the deception that the Clean Sweeps Machines scheme of the CITY CAPITAL CONSPIRATORS was providing high returns.

414.    In addition the CITY CAPITAL CONSPIRATORS indicated that the Clean Sweeps investment opportunities were limited by the number of machines to be sold to create added incentive for the investors/victims to act quickly in order to participate.

415.     A few months after she made her initial investment, MORGAN was told that the

CITY CAPITAL CONSPIRATORS were trying to reach her (which she believed was not true)

and that she needed to move her self-directed IRA from EQUITY TRUST to Sunwest Trust.

MORGAN was told that the change was necessary because EQUITY TRUST had become

"jealous" of all the money CITY CAPITAL was making. Again MORGAN and the other Class

members were directed to one employee of Sunwest Trust for any information on his investment

with Defendants.

416.     In May of 2010, MORGAN'S self-directed IRA was moved to Sunwest Trust,

3240-D Juan Tabo NE, Albuquerque, NM 87111  (Composite Ex. KKKK).

417.     MORGAN received a booklet from Sunwest Trust titled "A Custodial Self-

Directed Traditional IRA Plan Agreement" (Ex. LLLL).

418.     MORGAN also received a "Prohibited Transactions-Summary" from Sunwest

Trust. (Ex. MMMM).

419.     The CITY CAPITAL CONSPIRATORS in May of 2010 formed a Georgia

limited liability company for MORGAN called Infinite Acquisitions 119 LLC ("Infinite

Acquisitions") to hold her investments through Defendants. (Ex. NNNN).

420.     MORGAN'S investment of $19,070.00 in Clean Sweeps was wired from her

Infinite Acquisitions bank account to CITY CAPITAL'S Bank of America bank account (Bank

of America, account # 237018134155, routing number 026009593). MORGAN also invested

cash of $10,000 in the Sweeps Machines. (Ex. OOOO).

421.     MORGAN like the other Class members received a "Purchase Agreement" for the

Sweeps Machines from Defendants which noted that she was entitled to a "CERTIFICATE OF

SATISFACTION." (Ex. PPPP).

422. MORGAN received two CERTIFICATES OF SATISFACTION from Defendants. One CERTIFICATE OF SATISFACTION was dated May 24, 2010 for the amount of $9,994.00. (Ex. QQQQ).

423. MORGAN received a second CERTIFICATE OF SATISFACTION dated May 27, 2010 in the amount of $19,988. (Ex. RRRR).

424. These CERTIFICATES OF SATISFACTION stated that "*Sweep Income guarantees the machines(s) purchased will generate substantial revenues after twelve (12) months from the time of placement (usually within 45 days of the date of purchase.) If the equipment purchased does not live up to this expectation, SweepIncome will buy back the equipment from you for the amount listed above minus any distributions you receive. Distributions, which are based on the net proceeds (total revenue minus operating costs), will begin after the equipment has been placed for at least thirty (30) days.  These CERTIFICATES OF SATISFACTION stated: "SATISFACTION 100% GUARANTEED."*

425. MORGAN then received a letter dated June 3, 2010 from the CITY CAPITAL CONSPIRATORS indicating that they were "working" to have her machines in place by July 18, 2010, some 7 months after she had initially transferred her retirement funds to them. No explanation was ever given MORGAN for the delay. (Ex. SSSS).

426. MORGAN received two executed Purchase Orders from Defendants reflecting her investments. The first Purchase Order is dated July 16, 2010 in the amount of $9994.00 (Ex. TTTT).

427. The second Purchase Order is dated July 19, 2010 in the amount of $19,988.00. (Ex. UUUU).

428.     MORGAN and other Class members thereafter received a letter from Defendants dated August 20, 2010 advising her that her 6 Sweeps Machines had been placed on Newtown Road, Virginia Beach, Virginia. (Ex. VVVV).

429.     MORGAN was surfing the Internet in September of 2010 and found out by accident that her Sweeps Machines had been shut down by Virginia police after they raided the Virginia Beach location where her 6 machines were placed.  Virginia law enforcement had closed them as an illegal gambling operation. No one from the CITY CAPITAL CONSPIRATORS had contacted MORGAN or other Class members to let them know.

430.     MORGAN then called CITY CAPITAL and spoke to Richard Wynn, a manager, who assured MORGAN that she would be receiving her anticipated income from the Sweeps Machines and that MORGAN'S machines would be operational again in Virginia Beach by November 10th.

431.     Thereafter MORGAN received a letter dated October 20, 2010 indicating her machines would be back on line within 30 days and a check for $524.34 from Defendants which represented her anticipated profit from each of the 6 machines, i.e., $87.39 per machine for 6 machines.  This check was from CITY CAPITAL'S Bank of America account.  MORGAN went to Bank of America to cash the check but was advised by the bank representatives that there was no money in the bank account.  MORGAN has never received return of her investment monies, anticipated profits from her investment or interest. (Composite Ex. WWWW).

432.     On November 16, 2010, MORGAN received an email from James Contaccessa at www.selfdirectedassets.com_ indicating that Contascessa had become aware that CITY CAPITAL could be a fraud and that "individuals running the company have committed a scam." (Ex. XXXX).

433.    In November of 2010, MORGAN and other Class members received an email from a Scott Lindquist at www.sweepspotconsulting.com requesting that she sign a legal document through DocuSign which was a "management/placement agreement" for her Clean Sweeps machines.   This is the same Scott Lindquist who contacted plaintiff Gennet Thompson and tried to get her to invest again in sweepstakes machines through Sweet Spot Consulting in late 2010.  Plaintiffs believe Lindquist's activities were directed by TAYLOR. (Ex. YYYY).

434.    MORGAN sent an email back to Lindquist advising him of all of the problems she had with her investment and that she had not received her investment monies, received overcharges by Sunwest Trust and had considerable concerns about tax issues (Ex. ZZZZ).

435.    Just like EQUITY TRUST, Sunwest Trust was charging the Plaintiffs and other Class members administrative fees however CITY CAPITAL was also supposed to be paying these fees for the investors/victims.

436.    MORGAN than received an email from TAYLOR indicating that he was trying to find a solution and stating "I am cleaning up most of the results of the company using my name for what seems to be a nice gain."  (Ex. AAAAA).   MORGAN never heard from TAYLOR again and up to the filing of this Class Action Complaint, no solution has been found to make MORGAN or the other Class members whole.

437.    On March 17, 2011, MORGAN received an email from Meshelle Taylor, TAYLOR'S wife with a link to a video about another "leader's summit" where TAYLOR was a speaker on successful investment strategies. (Ex. BBBBB).

438.    MORGAN and other Class members were told repeatedly after the Sweeps Machine program was shut down that CITY CAPITAL had set up a trust fund to reimburse

victims of the CITY CAPITAL Ponzi schemes and that Defendants would return MORGAN'S investment funds plus interest and anticipated profits. (Ex. NNNNN).

439.    MORGAN received the same settlement documents, tolling agreement and information as the other Plaintiffs and Class members but she also did not receive any of her money back like the other Class members.  All of the representations made by Defendants that Plaintiffs and the other Class members were going to be made whole have proven to be false and MORGAN has been forced to file this action to try to recoup her lost investment monies, interest, overcharges and other damages

440.    In fact, TAYLOR made direct representations about personally meeting with MORGAN and others from her church to resolve the issues raised in this Complaint . TAYLOR never delivered on any of his promises to resolve MORGAN'S investment losses, meet with church members including MORGAN or otherwise rectify the wrongs committed against MORGAN and the other Class members.

441.    TAYLOR and the other CITY CAPITAL CONSPIRATORS were able to continue their Ponzi schemes inside of CITY CAPITAL for almost 5 years.  However, both the Socially Conscious Investment Ponzi Scam and the Clean Sweeps Machine Investment Ponzi Scam collapsed when the Clean Sweeps machines operations were shut down by law enforcement. As with all Ponzi schemes that eventually fail, there was no way for the CITY CAPITAL CONSPIRATORS to bring in new investors to cover their overdue payments to earlier investors or trick current investors into reinvesting their money since the illegality of the operation had been exposed and demands for refunds from the investors/victims were going unanswered.

442.     Some or all of the CITY CAPITAL CONSPRIATORS continue to solicit investments through sales of sweepstakes machines via at least three websites, www.sweepspotconsulting.com, www.sweeptechcapital.com (Ex. IIIII) and www.sixfigureclub.com (Ex. JJJJJ).

443.     TAYLOR also continues to solicit investments through public speaking engagements and visits to communities and churches. In fact, TAYLOR was scheduled to conduct a workshop on "Cash Flow Explosion Strategies" at the Liberty Temple Full Gospel Church in Bolingbrook, Illinois on February 27, 2011. As one pundit has correctly observed – another "Financial Terror Tour" by TAYLOR.

## COUNT I

## WIRE FRAUD

(Against all Defendants)

444.     Plaintiffs incorporate by reference and reallege herein paragraphs 1-443 above as if fully set forth herein.

445.     During the period from May 2006 until present, Plaintiffs and the Class members made investments in Ponzi schemes set forth herein orchestrated by Defendants.  Plaintiffs, by means of wire transfers by their banks in North Carolina and Georgia respectively, sent a total of $190,000 to Defendants' banks at various bank accounts in North Carolina, Ohio, New Mexico and Missouri as investment payments based upon the false and fraudulent representations of Defendants.

446.     Absent the fraud orchestrated by the Defendants, Plaintiffs and the other Class members would not have made any of the wire transfers mentioned above.

447. By engaging in the Socially Conscious Investment Ponzi Scam and the Sweeps Machine Investment Ponzi Scam, Defendants intentionally participated in a scheme, using the wires, to defraud Plaintiffs and the other Class members of money by means of material misrepresentations and omissions. Plaintiffs and other Class members reasonably relied on misrepresentations and material omission made by Defendants in furtherance of the fraudulent scheme. Plaintiffs and the other Class members suffered injury as a result of the fraud in the amounts of money Defendants obtained from Plaintiffs.

448. Through the foregoing conduct, Defendants having devised, and intending to devise, a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, promises, transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, signs and signals for the purpose of executing such scheme and artifice to defraud, in violation of 18 U.S.C. 1343.

## COUNT II

## <u>INTERSTATE TRANSPORTATION OF STOLEN PROPERTY</u>

(Against All Defendants)

449. Plaintiffs incorporate by reference and reallege herein paragraphs 1-448 above as if fully set forth herein.

450. In addition, the foregoing scheme and each act committed in furtherance therefore set forth in paragraphs 1-282 constitute violations of the National Stolen Property Act, 18 U.S.C. Section 2314 in that Defendants transported, transmitted and transferred in interstate commerce goods and money, of the value of $5,000 or more, knowing the same to have been stolen, converted and taken by fraud, in violation of 18 U.S.C. Section 2314.

# COUNT III

## MONEY LAUNDERING

(Against all Defendants)

451.    Plaintiffs incorporate by reference and reallege herein paragraphs 1-450 above as if fully set forth herein.

452.    Further, as part of Defendants' operation of the Socially Conscious Investment Ponzi Scam and the Sweeps Machine Investment Ponzi Scam, they engaged in, and otherwise caused, numerous financial transactions and transfers through financial institutions in the United States, which transactions violated 18 U.S.C. Sections 1956 and 1957.

453.    Defendants committed acts of money laundering, namely financial transactions, to promote their unlawful misappropriation of investor funds in violation of 18 U.S.C. Section 1956 (a) (1) (A) and to conceal their unlawful activity in violation of 18 U.S.C. Section 1956 (a) (1) (B).

454.    Upon information and belief, after the funds were received by the EQUITY TRUST, the EQUITY TRUST transferred the money to the CITY CAPITAL CONSPIRATORS and the  CITY CAPITAL CONSPIRATORS transferred the money to other accounts and used the funds for various purposes and for various other corporate entities controlled by the CITY CAPITAL CONSPIRATORS and used the funds for various purposes having nothing to do with the investments Plaintiffs and other Class members believed they were investing in.

455.    The foregoing scheme, as set forth in detail in paragraphs 1-263 and each act committed in furtherance thereof, constitutes money laundering within the meaning of 18 U.S.C. Sections 1956 and 1957 in that:

      a.    Defendants, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity,

conducted and attempted to conduct such financial transaction which in fact involved proceeds of a specified unlawful activity, namely wire fraud (18 U.S.C. §1343) and interstate transportation of stolen goods (18 U.S.C. §2314), knowing that the transactions were designed in whole or in part to promote the carrying on of the foregoing specified unlawful activity in violation of 18 U.S.C. §1956(a) (1)(A) (i);

b.      Defendants knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such financial transactions which in fact involved proceeds of a specified unlawful activity, namely wire fraud (18 U.S.C. §1343) and interstate transportation of stolen goods (18 U.S.C. §2314), knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location , the source, the ownership and the control of the proceeds of the foregoing specified unlawful activity, in violation of 18 U.S.C. §1956 (a) (1) (B) (i); and

c.      Defendants in an offense that took place in the United States, knowingly engaged or attempted to engage in monetary transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, namely wire fraud (18 U.S.C. §1343and interstate transportation of stolen goods (18 U.S.C. §2314) 18 U.S.C. § 1957.

d.      The Defendants committed acts of money laundering, namely financial transactions, to promote their unlawful misappropriation of investor funds in violation of 18 U.S.C. Section 1956 (a) (1) (A) and to conceal their unlawful activity in violation of 18 U.S.C. Section 1956 (a) (1) (B) and received the proceeds of its fraudulent schemes through the wires.

456.    In addition, the Defendants have violated 18 U.S.C. §1341 and §1343 by communicating by United States email, telephone and facsimile with each other in furtherance of their use of the Enterprises to carry out the fraudulent and deceptive investment schemes described herein.

457.    The Defendants engaged in the above-described conduct in furtherance of and for the purpose of executing a fraudulent and illegal course of conduct and scheme or artifice to defraud as described in this Complaint.

458.    The Defendants either individually or in combination with themselves, transported, transmitted or transferred in interstate commerce money of the value of $5,000 or

more, representing investments by victims, knowing the same to have been taken by fraud from Plaintiffs and the other Class members in violation of 18 U.S.C. § 2314.

**COUNT IV**

**Violation of 18 U.S.C. §1962 (c)-Racketeering**

(Against all Defendants)

459.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs 1-458 as if set forth at length herein.

460.     This Count asserts violations of 18 U.S.C. §1962 (c) against Defendants TAYLOR, WCONNOR, DCONNOR, BRANTLEY and MCCARTHY.

461.     Each Defendant is a "person" within the meaning of 18 U.S.C. §1961(3).

462.     At all times relevant to this action, CITY CAPITAL was an "enterprise" within the meaning of 18 U.S.C. §1961 (4) that was engaged in or affected trade or commerce.

463.     At all times relevant to this action, IEU was an "enterprise" within the meaning of 18 U.S.C. §1961 (4) that was engaged in or affected trade or commerce.

464.     At all times relevant to this action, WEB3 was an "enterprise" within the meaning of 18 U.S.C. §1961 (4) that was engaged in or affected trade or commerce.

465.     At all times relevant to this action, SWEEPSVEND was an "enterprise" within the meaning of 18 U.S.C. §1961 (4) that was engaged in or affected trade or commerce.

466.     Defendants TAYLOR, WCONNOR, BRANTLEY, and MCCARTHY have caused CITY CAPITAL, IEU, SWEEPSVEND and WEB3, to engage in and affect interstate commerce through developing, advertising, and selling the Socially Conscious Investment Ponzi Scam and the Sweeps Machine Investment Ponzi Scam to hundreds or thousands of

victims/investors through the United States via email solicitations, radio and television commercials and other means.

467. At all times relevant to this class action, Defendants TAYLOR, WCONNOR, BRANTLEY and MCCARTHY have conducted or participated, directly or indirectly in the management and operation of CITY CAPITAL, IEU, SWEEPSVEND and WEB3 through a pattern of racketeering activity in violation of 18 U.S.C.§1962 (c) and the fraudulent investment schemes set forth in this Complaint ("Enterprise") is an association in fact within the meaning of 18 U.S.C. §1961 (4), comprised of these Defendants as the Enterprise's members. The Enterprise is an organization, functioning as an ongoing and continuing unit that was created or used as a tool by these Defendants in order to effectuate through a pattern of racketeering activity as alleged in this Complaint and achieve the commons goals of financial gain from investors' proceeds such as Plaintiffs and the Class members.

468. At all times relevant to this action, Defendants TAYLOR, WCONNOR, DCONNOR,BRANTLEY and MCCARTHY willfully engaged in fraudulent conduct with the purpose to defraud investors including the Plaintiffs and other Class members, including acts constituting wire fraud in violation of 18 U.S.C. §1343.

469. Defendants TAYLOR, WCONNOR, DCONNOR,BRANTLEY and MCCARTHY 's use of the wires to participate and conduct the affairs of CITY CAPITAL, IEU, SWEEPSVEND and WEB3 include but are not limited to:

     a.    Television commercials, email solicitations, internet postings and radio commercials in which investments in CITY CAPITAL were represented as "socially conscious," sound financial decisions, that were "100% legal" and provided "guaranteed" investment income and ROI as described more fully in the preceding paragraphs;

     b.    Website and email communications that falsely and misleadingly claimed that investments in CITY CAPITAL were guaranteed to provide a greater

ROI than other investments, that investments in CITY CAPITAL were "socially conscious" investments; that CITY CAPITAL was building homes and businesses in working class neighborhoods with the investment monies received; that the investors' money was insured, protected and invested by persons in legitimate, amazingly profitable, "leading" companies with "the highest ethics" as described more fully in the preceding paragraphs;

      c.     TAYLOR, WCONNOR, DCONNOR, BRANTLEY and MCCARTHY devised, and intending to devise, a scheme and artifice to defraud Plaintiffs through a fraudulent scheme, and for obtaining money and property by means of false and fraudulent pretenses, representations, promises, transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, signs and signals for the purpose of executing such scheme and artifice to defraud, in violation of 18 U.S.C. 1343.

470.    Each of the numerous emails, interstate wire communications, interstate transfer of monies via wire that were made in furtherance of TAYLOR, WCONNOR, DCONNOR, BRANTLEY AND MCCARTHY's scheme to defraud Plaintiffs constitute separate and distinct acts of "racketeering activity" as that term is defined in 18 U.S.C. §1961 (1).

471.    TAYLOR, WCONNOR, DCONNOR, BRANTLEY and MCCARTHY's use of CITY CAPITAL, IEU and WEB3 to carry out a pattern of racketeering activity dates back to at least 2006 and has since continued without interruption.

472.    The racketeering activities of TAYLOR, WCONNOR, DCONNOR BRANTLEY and MCCARTHY are part of their ongoing business and constitute a continuing threat because they are still occurring on a daily basis.

473.    The Defendants' racketeering activities as described in this Complaint, amounted to a common course of conduct in which the Defendants intended to deceive and harm Plaintiffs and the other Class members. Each racketeering activity alleged was related, had similar purposes, involved the same or similar participants and methods of commission and had similar results affecting similar victims including Plaintiffs and the Class. The Enterprise functioned as a

continuing unit with each member of the Enterprise knowing their role and performing their part to assure the Enterprise's success.

474.     By committing such offenses, which victimized Plaintiffs and the other Class members and which continue today and are likely to continue in the future, TAYLOR, WCONNOR, MCCARTHY and BRANTLEY have engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961 (5).

475.     Plaintiffs and the Class members have been injured in their property by reason of the violations alleged in this Complaint in that Plaintiff and the Class members have invested millions of dollars in now apparently worthless "investments" that they would not have purchased or bought had these Defendants not engaged in their pattern of racketeering activity.

476.     The injuries to Plaintiffs and the Class members were directly and proximately caused by these Defendants' racketeering activity as described above.

477.     By virtue of their violations of 18 U.S.C. §1962 (c), TAYLOR, WCONNOR, MCCARTHY and BRANTLEY are jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs and the Class members suffered as a result of Defendants' scheme to defraud plus the costs of this suit including reasonable attorney's fees.

## COUNT V

## Violation of 18 U.S.C. §1962 (a)

(against all Defendants)

478.     Plaintiffs incorporate by reference and reallege herein paragraphs 1-477 above as if fully set forth herein.

479.     The CITY CAPITAL CONSPIRATORS received income from the pattern of racketeering described in this Complaint.

480. The CITY CAPITAL CONSPIRATORS used and invested the income from the pattern of racketeering activity alleged in this Complaint to invest in the operation of the Enterprise in order to perpetuate their fraudulent scheme.

481. The Enterprise described in this Complaint affected and continues to affect interstate commerce.

482. By virtue of these violation so RICO, 18 U.S.C. §1962 (a), Plaintiffs and the Class members were injured in their property by the Defendants' use and investment of racketeering income and the Defendants are liable to Plaintiffs and the Class members for three times the damages Plaintiffs and the Class have sustained, plus costs of this suit and reasonable attorney's fees.

## COUNT VI

## Violation of 18 U.S.C. 1962 (b)

(against all Defendants)

483. Plaintiffs incorporate by reference and reallege herein paragraphs 1-482 above as if fully set forth herein.

484. The CITY CAPITAL CONSPIRATORS received income from the pattern of racketeering described in this Complaint.

485. These Defendants used and invested the income from the pattern of racketeering activity alleged in this Complaint to invest in the operation of the Enterprise in order to perpetuate their fraudulent scheme.

486. The Enterprise described in this Complaint affected and continues to affect interstate commerce.

487. By virtue of these violation of RICO, 18 U.S.C. §1962 (b), Plaintiffs and the Class members were injured in their property by the Defendants' use and investment of racketeering income and the Defendants are liable to Plaintiffs and the Class members for three times the damages Plaintiffs and the Class have sustained, plus costs of this suit and reasonable attorney's fees.

## COUNT VII

### Violation of 18 U.S.C. §1962 (d)

(against all Defendants)

488. Plaintiffs incorporate by reference and reallege herein paragraphs 1-487 above as if fully set forth herein.

489. Section 1962 (d) of RICO provides that it shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b) or (c) of this section."

490. The CITY CAPITAL CONSPIRATORS have violated §1962 (d) by conspiring to violate RICO, 18 U.S.C. §1962 (c) as alleged in this Complaint. The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of affairs of the Enterprise through a pattern of racketeering activity.

491. The CITY CAPITAL CONSPIRATORS have engaged in numerous overt acts in furtherance of the conspiracy as described in this Complaint, including multiple instances of wire fraud and interstate transportation of stolen property said violations include but are not limited to:

    a.    knowingly soliciting "investors" for CITY CAPITAL;

    b.    knowingly serving as a fund custodian for the CITY CAPITAL;

"investors" and providing the victims' money to CITY CAPITAL, EQUITY TRUST, SWEEPVEND and IEU;

c.       issuing inaccurate account statements that concealed repeated defaults on the promissory notes that the EQUITY TRUST' clients, including the Plaintiffs and member of the Class, had purchased.

d.       knowingly communicating by wire with Plaintiff and the Class members to maintain accounts and solicit further payments to CITY CAPITAL and IEU; and collecting, transferring and hiding shared revenues.

492.    The nature of the above-described Conspirators' acts in furtherance of the conspiracy gave rise to a plausible inference that each of these Defendants agreed to the objective of violating RICO, 18 U.S.C. §1962 (c) and that by conspiring to violate RICO, 18 U.S.C. §1962 (c) they were aware that their ongoing fraudulent acts were and are part of an overall pattern of racketeering activity.

493.    Plaintiffs and the Class members have been injured in their property by reason of the conspiracy alleged herein in that Plaintiffs and the Class members have provided funds to the CITY CAPITAL CONSPIRATORS that have apparently been lost to the Enterprise, and that Plaintiffs and the Class would not have paid had Defendants not conspired to violate RICO, 18 U.S.C. §1962 (c).

494.    The injuries of Plaintiffs and the Class members were directly and proximately caused by the conspiracy to violate RICO, 18 U.S.C. §1962 (c) as described above.

495.    By virtue of these violations of RICO, 18 U.S.C. §1962 (d), Defendants are liable to Plaintiffs and the Class members  for three times the damages that Plaintiffs and the Class have sustained, plus the costs of this suit including reasonable attorney's fees.

# COUNT VIII

## CONVERSION

### (against all Defendants)

496.     Plaintiffs incorporate the allegations and Exhibits contained in paragraphs 1-495 above as if restated and fully set forth herein.

497.     This is a claim for conversion.

498.     As described more fully above, the "investment" programs of Defendants that Plaintiffs and the other Class members invested in were bogus and Defendants were operating a series of Ponzi schemes which permitted Defendants to exercise unauthorized dominion and control over the property of Plaintiffs and the other Class members when they absconded with the Plaintiffs' and other Class members' money that Defendants took and appropriated for their own use.

499.     Defendants' conversion has permanently deprived Plaintiffs and the other Class members of their property.

500.     Plaintiffs and other Class members have repeatedly demanded, and were promised by Defendants, that their funds would be returned but Defendants did not in fact return them.

501.     Defendants' actions have directly caused injury and damages to Plaintiffs and the Class members.

**COUNT IX**

**CONSPIRACY**

(against all Defendants)

502.     Plaintiffs incorporate by reference and reallege herein paragraphs 1-503 above as if fully set forth herein.

503.     At all relevant times, all Defendants joined in a common effort to commit the tortuous conduct and violations of state and federal law alleged in this complaint.

504.     Defendants made their fraudulent misstatements and committed fraud as alleged above in part in order to induce Plaintiffs and the other Class members to invest in CITY CAPITAL.

505.     The Defendants planned and together pursued this fraudulent course of conduct.

506.     As a result of the Defendants' conspiracy, Plaintiffs and the other Class members have suffered considerable financial loss.

**COUNT X**

**INTENTIONAL FRAUD**

(against all Defendants)

507.     Plaintiffs incorporate by reference and reallege herein paragraphs 1-506 above as if fully set forth herein.

508.     The CITY CAPITAL CONSPIRATORS made several misrepresentations to the public at large and to the Plaintiffs and the Class members as set forth above.

509.     These Defendants knew that these statements were false when they made them.

510.     These Defendants intended for Plaintiffs and the Class members to rely upon their false statements.

100

511.     Plaintiffs and the Class members did rely on these Defendants' false statements, and would never have invested in CITY CAPITAL were it not for the false statements.

512.     These Defendants have enjoyed substantial financial gain, and Plaintiffs and the other Class members have suffered severe financial loss as a result of the reliance of Plaintiffs and other Class members on these false statements.

**COUNT XI**

**<u>NEGLIGENT MISREPRESENTATION</u>**

(against all Defendants)

513.     Plaintiffs incorporate by reference and reallege herein paragraphs 1-512 above as if fully set forth herein.

514.     The CITY CAPITAL CONSPIRATORS made several misrepresentations to the public at large and to the Plaintiffs and the Class members as set forth above.

515.     These Defendants should have known that these statements were false when they made them.

516.     These Defendants intended for Plaintiffs and the Class members to rely upon their false statements.

517.     Plaintiffs and the Class members did rely on these Defendants' false statements, and would never have invested in CITY CAPITAL were it not for the false statements.

518.     These Defendants have enjoyed substantial financial gain, and Plaintiffs and the other Class members have suffered severe financial loss as a result of Plaintiffs' and Class members' reliance on false statements.

# COUNT XII

## BREACH OF FIDUCIARY DUTY

(against all Defendants)

519.     Plaintiffs incorporate the allegations and Exhibits contained in paragraphs 1-518 above as if restated herein.

520.     At all times material hereto, the Defendants owed the Plaintiffs and the other Class members a fiduciary duty for reasons including, but not limited to, Defendants held themselves out as investment advisors and custodians to Plaintiffs and the other Class members, and the fact that they purported to serve Plaintiffs and the other Class members as competent custodians of their investments and as participants in a common investment scheme.

521.     These Defendants breached their fiduciary duties through their actions by investing the Plaintiffs and other Class members' money in a Ponzi scheme or schemes; working together to perpetuate the false notion that TAYLOR was a successful, multimillionaire and would help Plaintiffs make double or triple their ROI; mismanaging the CITY CAPITAL investments;  issuing inaccurate account statements that concealed repeated defaults on the promissory notes that the EQUITY TRUST' clients, including the Plaintiffs and member of the Class had purchased; overcharging the Plaintiffs and other Class members for their services; withdrawing funds from CITY CAPITAL for personal use; and by profiting from these things at Plaintiffs and other Class members' expense.

## COUNT XIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER

## G.S. 75-1.1 et seq.

(against all Defendants)

522.     Plaintiffs incorporate the allegations and Exhibits contained in paragraphs 1-521 above as if fully restated herein.

523.     Plaintiffs and the Class members have suffered, and continue to suffer, actual injury in fact due to the willful acts of Defendants which are contrary to the public policy of North Carolina, are substantially injurious to consumers of North Carolina and constitute unfair trade practices under G.S. 75-1.1.

524.     Defendants' deliberate acts of fraud and misrepresentation accomplished through Ponzi schemes involving" investments" in illegal gambling activities, shell companies and ghost investment vehicles orchestrated by Defendants without regard to Plaintiff's legal and equitable rights constitute acts of unlawful, unfair or deceptive business acts and practices that are injurious to the public within the meaning of North Carolina's *Unfair Trade Practices Act*.

525.     Pursuant to G.S. 75-1.1, Plaintiffs and the Class members seek an order from this Court prohibiting Defendants from engaging or continuing to engage in the unlawful, unfair, or deceptive business acts or practices set forth in this Complaint and/or ordering that Defendants perform their obligations under the law and reimburse Plaintiffs and the Class members all monies owed them as alleged in this Complaint.

526.     Plaintiffs and the Class members additionally requests an order from this Court pursuant to G.S. 75-1.1 requiring that Defendants make restitution of profits and return or pay to Plaintiffs all of Defendants' ill-gotten gains obtained from its illegal transactions and Ponzi

schemes and/or pay restitution, including the amount of monies that should have been paid had Defendants complied with their legal obligations, or, as equity requires.

527. Plaintiffs and the Class members further request a court order that an asset freeze or constructive trust be imposed over all monies in Defendants' possession which rightfully belong to Plaintiffs.

528. Plaintiff requests judgment and restitution from Defendants in an amount to be proven at trial for unfair, fraudulent and illegal business practices, treble damages and attorney's fees pursuant to G.S. 75-1.1 together with court costs.

## COUNT XIV

## NEGLIGENCE

(against EQUITY TRUST)

529. Plaintiffs and the Class members reallege and incorporate by reference as if fully set forth herein, paragraphs 1-528 above.

530. EQUITY TRUST owed Plaintiffs a duty of ordinary and reasonable care which arise from their relationships with them and their position and status. EQUITY TRUST also owe Plaintiffs and Class members duties of ordinary and reasonable care applicable to banks and financial institutions holding custody of customer's assets and accounts, as well as just and equitable principals of their respective trades. EQUITY TRUST breached their duties owing to Plaintiffs and the Class members.

531. EQUITY TRUST breached their obligations to Plaintiffs and Class member by and through their: 1. Failure to maintain actual custody; 2. Failure to perform sufficient due diligence to safeguard and ensue the existence and continued existence of Plaintiffs' funds; 3. failure to perform sufficient due diligence to ensure that account statement sent to Plaintiffs did

not report false and deceptive asset "values"; and 4. Failure to disclose material facts to Plaintiffs and the other Class members. EQUITY TRUST'S conduct and failures, in sum and substance, breached duties of reasonable care owing to Plaintiffs.

532.    As a result of the wrongful conduct of Defendants, Plaintiffs and the other Class members have suffered and will continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

## COUNT XV

## CIVIL CONSPIRACY

(against all Defendants)

533.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 535 of this Complaint as if fully set forth herein.

534.    Each and every one of the Defendants were engaged in a civil conspiracy to obtain property from Plaintiffs through fraudulent means.

535.    Each and every one of the Defendants agreed to commit the unlawful acts set forth in paragraphs 1-432 herein, which were intended to advance and which did advance and facilitate the objectives of the conspiracy.

536.    Each and every one of the Defendants has committed both unlawful and lawful overt acts in furtherance of the conspiracy, including but not limited to the acts set forth above, which were intended to advance and which did advance and facilitate the objectives of the conspiracy.

537.    As a direct, proximate and readily foreseeable consequence of the civil conspiracy and the acts committed in furtherance of the civil conspiracy, Plaintiffs and the other Class members have been harmed  by loss of their money and property as a result thereof.

538.     As a direct, proximate and readily foreseeable consequence of the civil

conspiracy and the acts committed in furtherance of the civil conspiracy, Plaintiffs have suffered

substantial monetary damages in an amount to be proven at trial, and will continue to incur costs,

expenses and legal fees as a result thereof.

## COUNT XVI

## VIOLATION OF NORTH CAROLINA SECURITIES ACT  Chapter 78A-10

(Against all Defendants)

542.     Plaintiffs incorporate by reference and reallege herein paragraphs 1-541 above as

if fully set forth herein.

543.     The acts and practices of the Defendants alleged herein violated Chapter 78A-10

of the North Carolina Securities Act, in that Defendants made, or caused to be made,

representations or statements which were false, where (i) they knew the truth, or (ii) with

reasonable efforts could have known the truth, or (iii) made no reasonable effort to ascertain the

truth, or (iv) did not have knowledge concerning the representations or statements made, where

said representations or statements were engaged in to induce or promote the issuance,

distribution, exchange, sale, negotiation, or purchase within or from this state of securities.

## COUNT XVII

## VIOLATION OF NORTH CAROLINA SECURITIES ACT Chapter 78A-8

(Against all Defendants)

544.     Plaintiffs repeat and re-allege paragraphs 1 through 543 above as if fully set forth

herein.

545.     The acts and practices of the Defendants alleged herein violated Chapter 78A-8 of the

North Carolina Securities Act, in that they involved the use or employment of a fraud, deception,

concealment, suppression, or false pretense, where said uses or employments were engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation, or purchase within or from this state of securities.

## COUNT XVIII

### VIOLATION OF NORTH CAROLINA SECURITIES ACT Chapter 78A-11

(Against all  Defendants)

546.    Plaintiffs repeat and re-allege paragraphs 1 through 545 above as if fully incorporated herein.

547.    The acts and practices of the Defendants alleged herein violated Chapter 78A-11 of the North Carolina Securities Act, in that they involved the use or employment of a fraud, deception, concealment, suppression, or false pretense, where said uses or employments were engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation, or purchase within or from this state of securities by the use of unlawful telephone rooms in violation of Chapter 78A-11.

## COUNT XIX

### VIOLATION OF NORTH CAROLINA'S RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, N.C.G.S. § 75D, *et seq.*,

(Against all Defendants)

548.    Plaintiffs repeat and re-allege paragraphs 1 through 547 above as if fully set forth herein.

549.    This is a cause of action against Defendants for violation of North Carolina's Racketeer Influenced and Corrupt Organization (RICO) Act, N.C.G.S. § 75D, *et seq*.,

550.    The conduct of Defendants set forth herein constitutes violations of North Carolina's Rico Act as set forth above.

551.    Defendants have has violated North Carolina's RICO Act, by using and investing income by means of wire transfer received from a pattern of racketeering through an illegal Ponzi scheme, directly or indirectly, to establish and operate an illegal enterprise, and by conducting or participating, directly or indirectly, in the illegal enterprise through a pattern of racketeering activity.

552.    As a direct result, Plaintiffs have been injured in their business or property by both the predicate acts which make up Defendants' patterns of racketeering activity and their investment and reinvestment of income obtained through wire transfer via an illegal Ponzi scheme therefrom to operate, expand and perpetuate the enterprise.

553.    Specifically, Plaintiffs and other Class members have been injured in their business and property by Defendants' refusal to return the monies Plaintiffs invested in CITY CAPITAL'S Socially Conscious Investment Ponzi Scam and Sweeps Machine Investment Ponzi Scam, the income Plaintiffs and other Class members were guaranteed from the investments or interest on their investment which Defendants guaranteed.

554.    The acts of Defendants have directly caused injury and damage to Plaintiffs and other Class members.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, on behalf of themselves and all others similarly situated, demand upon Defendants jointly and severally for:

1.    An order certifying the case as a class action;

2.    An order appointing Plaintiffs as the Class Representatives of the Class;

3.    An order appointing undersigned counsel and their firms as counsel for the Class;

4.     Compensatory, statutory, treble and punitive damages;

5.     An order from this Court pursuant to G.S. 75-1.1 requiring that

       Defendants make restitution of profits and return or pay to Plaintiffs all of

       Defendants' ill-gotten gains;

6.     An order that an asset freeze or constructive trust be imposed over all

       monies in Defendants' possession which rightfully belong to Plaintiffs;

7.     Pre and post-judgment interest as allowed by law;

8.     An award of taxable costs; and

9.     Any and all such further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the Class Members, hereby demand a trial

by jury as to all issues so triable as a matter of right.

Respectfully submitted, this the 7th day of October, 2011.


SCHILLER & SCHILLER, PLLC

                                        **Co-counsel to be admitted *pro hac vice*:**

By:   /s/ David G. Schiller            Cathy J. Lerman (Florida Bar # 338788)
      David G. Schiller (NCSB # 26713)  CATHY JACKSON LERMAN, P.A.
      Professional Park at Pleasant Valley  7857 W. Sample Road, Suite 140
      5540 Munford Road, Suite 101      Coral Springs, FL 33065
      Raleigh, North Carolina 27612     Tel: 954-663-5818
      Tel: 919-789-4677                 Fax: 954-341-3568
      Fax: 919-789-4469
                                        James P. Gitkin (Florida Bar # 570001)
                                        SALPETER GITKIN, LLP
                                        Museum Plaza, Suite 503
                                        200 South Andrews Avenue
                                        Fort Lauderdale, Florida 33301
                                        Tel: 954-467-8622
                                        Fax: 954-467-8623